Filed 11/5/13  In re T.H. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re T.H., et al., Persons Coming Under the Juvenile Court Law. | B247304 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>W.H.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK80737) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Law Office of John M. Kennedy and John M. Kennedy, under appointment by the Court of Appeal, for Defendant and Appellant.

John Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel for Plaintiff and Respondent.

_____

W.H. appeals the juvenile court's termination of his parental rights to his daughters T.H., Ciara H., and C.H., on the ground that the children are not adoptable. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

T.H., Ciara H., and C.H., all under the age of eight years old in January 2010, lived with their mother, her boyfriend Eric T., and the children's half-sibling.[1] The Los Angeles County Department of Children and Family Services (DCFS) began to investigate the family after receiving a report that the half-sibling had suffered a severe burn but had not received medical treatment. DCFS found the child, 18 months old, with burns on her chin, her entire chest, and her stomach; her skin was peeling off and some of the burned areas were bleeding and swelling. She was admitted to the hospital with infected second- and third-degree burns.

In the course of the investigation, the children's mother reported that her boyfriend committed domestic violence and threatened to kill her, but that she allowed him to live with her because he helped pay expenses and provided child care. The mother told DCFS that Eric T. had hit one of the children in the past. T.H., Ciara H., and C.H. told DCFS that Eric T. hit the children. The oldest child, T.H., reported to DCFS that when Eric T. got mad, he and the mother would throw items at each other. She had seen Eric T. hit C.H.; she also saw mother throw crayons and a knife at him, and hit him with a broom on the head. T.H. reported that her mother hit her with a belt, and that Eric T. had hit Ciara H. with a belt. The children had no visible fresh marks but displayed old injuries that had healed.

DCFS took the children into protective custody. T.H. spoke freely with DCFS, smiled, and was friendly and cheerful. Middle sister Ciara H. also spoke freely, was potty trained and ready to go to school, and liked books. The youngest sister, C.H.,

---

[1] The half-sibling is not a subject of this appeal.

imitated her older sisters, was cheerful, and liked picture books.  The children were observed to hit each other.

DCFS filed a dependency petition alleging that T.H., Ciara H., and C.H. fell within juvenile court jurisdiction under Welfare and Institutions Code[2] section 300, subdivisions (a), (b), (g), and (j).  The children were placed with a nonrelative caregiver.  The caregiver reported that T.H. was very emotional, including having sleeping difficulties and crying often.  The caregiver believed that T.H. needed counseling; DCFS believed that the younger children should be assessed for counseling needs as well.  The children adjusted to their foster home, growing increasingly respectful of their foster mother.

A Multi-Disciplinary Assessment Team assessed the family in March 2010.  All three children bore scars on their foreheads and faces; the older two children reported that these scars came from having objects thrown at them by their mother and Eric T.  All presented as anxious and worried, with a high activity level and limited focus.  The three children were disinhibited to varying degrees and tended to react to their feelings or act on impulse without ability to control or edit their responses.  They were needy, attention-seeking, and indiscriminately affectionate; their presentation was consistent with being deprived of attention, neglected, and abused physically and emotionally.  Each reported violent dreams.  The three children were generally in good physical health.

T.H. was aggressive toward her siblings, did not listen when instructed to stop inappropriate behaviors, and was unable to self-soothe.  She "obsessively expresse[d] her worries, fears, anxiety & preoccupation with sex, safety & domestic violence issues."  She disclosed information about sexual acts that she saw performed by her mother and Eric T.  She reported being sexually abused.  T.H. had achieved her childhood milestones, and her gross and fine motor skills were age-appropriate.  Her speech skills were very well-developed, and she had an extensive vocabulary.  She was performing at an average level in school, but had difficulty concentrating and remaining on task; her

---

**2**     All further statutory references are to the Penal Code.

3

teacher believed she was capable of higher achievement. T.H. lacked social skills and was described as a loner at school.

Ciara H. often broke down and cried uncontrollably; she could not be soothed. She described sexual abuse between her mother and Eric T. She seemed to be obsessed with domestic violence. Like her older sister, Ciara H. was very verbal with an extensive vocabulary. She was bright and capable of academic achievement, but had not been regularly exposed to educational materials. At the age of five, she was learning to count, identify colors, sing her alphabet, and use writing tools; she did not know how to write her name. Her foster parent was reading with her, using colors and shapes, and working to bring her up to age-appropriate levels.

Three year-old C.H. was the most aggressive child and was often angry. She expected immediate response to her needs, and was prone to running away from caregivers in busy locations. The caregivers were working to establish boundaries with her and to model appropriate social interactive behaviors. Her gross motor skills were well-developed, and her fine motor skills age-appropriate. Like her sisters, she was verbal and communicated accurately and in great detail. She was openly emotional and cried when talking about domestic abuse of her mother. C.H. wanted to go to school and already knew how to hold her pencil appropriately. She could identify some colors and draw some shapes but could not yet write her name. She had recently begun preschool and was very happy to be going to school and making friends.

As of March 2010, the children's placement was functioning well. The caregivers were cooperative and attuned to the needs of the children. The children were reported to get along well with all family members. The caregivers were working with the children's therapist to understand them and to provide appropriate care and boundaries. Their aggression had decreased dramatically and the children were making significant progress.

In early April, however, the foster mother found T.H. and C.H. in bed together without clothes: they reported that they were "kissing and having sex," as they had seen their mother do. The children's therapist subsequently recommended that DCFS consider whether to split the children up between placements because she feared that the foster

4

parents, though highly committed to the children's safety and emotional healing, would be overwhelmed due to the children's significant needs. The caregivers were staying up all night long to maintain round-the-clock supervision and to prevent further inappropriate sexual activity between the children. Later that month, the children were moved to a new placement.

In June 2010, the juvenile court declared the children to be dependent children of the court under section 300, subdivisions (a) and (b).

As of July 2010, Ciara H. had begun taking a psychotropic medication; she responded well, and her impulsivity had decreased. The children each received short-term, one-to-one behavioral interventions to redirect some negative behaviors they displayed. The children continued to be defiant and physically aggressive, and T.H. continued to act out sexually, which jeopardized her placement. The children continued to participate in therapy to address aggression, profanity with peers, and emotional dysregulation.

By December 2010, T.H. had been separated from her sisters and moved through several different placements. T.H. was described as forthcoming in therapy, and she was working on abandonment issues, peer pressure, parentification, and lying. She had exhibited sexualized behaviors and had inappropriate conversations with younger children. As of December 2010, T.H. had been re-placed with a former foster parent because the foster parent believed that she could make a difference in T.H.'s life. T.H. appeared to be bonded with this caregiver and was happy to be returned to her. T.H. was taking psychotropic medications in addition to undergoing therapy.

Ciara H. and C.H. were also bonded with their foster parents, who had volunteered for permanent placement should reunification efforts fail. These two children were reported to be thriving and to have made "incredible improvement with their behaviors." Ciara H. was very excited about attending kindergarten and was an eager learner. She attended therapy regularly and participated actively. Ciara H.'s prognosis was good. She was excited to participate in therapy, maintained a cooperative attitude, and was demonstrating progress toward the goals of her treatment. Being in a stable and nurturing

home environment had helped to stabilize her mood and behavior. Ciara H. was a "healthy and happy child," developing appropriately.

C.H. was also attached to her caregivers and called them "mommy" and "daddy." A "bright little girl," C.H. loved to sing, enjoyed being outdoors, and acted as a leader. C.H. also had a good prognosis: she actively participated in therapy and was cooperative some of the time. At other times, she wanted to control the therapy. C.H. was learning to adhere to limitations and had made some improvement with behavior issues. At the age of four, she was still throwing temper tantrums and screamed loudly when she did not get her way. C.H. was taking psychotropic medications in addition to her therapy.

As of April 2011, the children's placements were unchanged and they were reported to be developing appropriately. T.H. was doing well in school and in therapy, and she was not exhibiting any behavioral issues. C.H. had overcome some earlier speech limitations and her speech and language skills were now within the expected range for her age.

In April 2011, T.H. was moved to a new placement due to conflict with another child placed in the home. DCFS began efforts in May 2011 to obtain Wraparound services for T.H., as well as to obtain a D-rate for her (a special funding category for children with special mental health needs). The following month, the younger children were moved to another placement closer to their mother.

As of July 2011, T.H. was struggling academically due to the school changes that accompanied her placement changes. She was set to begin Wraparound services and was concluding her therapy with her former provider as a result. The former therapist described T.H. as having made tremendous progress; she assessed T.H.'s prognosis as good. Ciara H. and C.H. remained placed together; they were fighting regularly, and Ciara H. antagonized C.H. Ciara H. reported that she wanted C.H.'s attention, but C.H ignored her, and she felt that her sister did not love her. Ciara H. wanted C.H. removed from the home. C.H. reported hearing voices in the night telling her to come eat with them, and she was experiencing sleeping difficulty unless she ate in the middle of the night.

6

DCFS performed adoption assessments for the children in July 2011. T.H.'s former caregiver was willing to care for her again, and told DCFS that she had not wanted T.H. removed from her care. She said that she loved T.H., that she would accept her at any time, and that she would care for her as long as necessary; but that she (the caregiver) was not interested in committing to a permanent plan because of her age and her many grandchildren. The caregiver for the younger girls expressed a preference for legal guardianship over adoption in the hope that someday the children's mother would be able to reunite with them; if, however, adoption was selected as the permanent plan, she wanted to be considered as the adoptive parent. DCFS believed all three children were likely to be adopted.

The following month, social workers documented that C.H. was acting out sexually with dolls and with her older sister Ciara H. after witnessing T.H. engaging in similar behavior. The children's therapist was working with the children and the foster parent to address these behaviors. DCFS began working on obtaining more intensive services such as Wraparound services for these two children.

In September 2011, family reunification services were terminated and a permanent plan hearing was set for January 2012. In late December 2011, C.H. was removed from her placement because of physical abuse between her and Ciara H. She was placed in February 2012 in the home of R.W., a D-rate certified caregiver. By the following month R.W. had been identified as a prospective adoptive parent for C.H. and also for T.H., who began weekend visits with R.W. Ciara H.'s caregiver was interested in adopting her. All three children were approved for D-rates and were receiving Wraparound services.

As of May 2012, both T.H. and C.H. were placed with prospective adoptive parent R.W. T.H., diagnosed with oppositional defiant disorder, no longer needed psychotropic medication. R.W. reported that T.H. was often defiant, and that she and the Wraparound team were addressing T.H.'s behavioral issues. C.H. was reported to be diagnosed with attention deficit hyperactivity disorder and reactive attachment disorder. She was taking medication and receiving Wraparound services. C.H. continued to be defiant at home and at school, and these issues were being addressed by the caregiver and the

Wraparound team. R.W. reported that since C.H.'s medication regimen had been changed, C.H. was much calmer and did not act out as much. R.W. was committed to adopting the two children; she acknowledged that they were "a hand[]ful[]" but stated, "[W]e will work out the problems as a family."

Ciara H. remained placed with her prospective adoptive parent, and she had adjusted well to the home. Ciara H., diagnosed with generalized anxiety disorder and reactive attachment disorder, remained on her medication. Her caregiver reported that she sometimes acted out when she did not get her way, and when this occurred, she was placed in time out. The prospective adoptive parent was committed to Ciara H. and said that together they were a loving family. Ciara H.'s prospective adoptive parent had undergone D-rate training.

The children remained in their placements as of August 2012. Each child had adjusted well to her placement, and each reported being happy in her home. T.H. told DCFS she wanted R.W. to adopt her. The Wraparound services provider observed that the children had made significant progress in the past 10 months. R.W. could see a difference in T.H.'s behavior at school and at home. C.H. had made behavioral progress at home, although she still had difficulty following instructions at school. Ciara H. was having tantrums and crying spells, as well as minor difficulties at school. The service provider reported that both prospective adoptive parents were very involved in the children's activities at home and in school and were proactive about stabilizing the children's economic and living arrangements. The prospective adoptive parents provided monthly sibling visits. Home studies were delayed for both prospective adoptive parents; in one case this was due to the caregiver experiencing a medical problem, and in the other because a DCFS referral had been received. Both issues were to be addressed in the home studies.

As of December 2012, the children remained in their placements and the prospective adoptive parents remained committed to the children. The DCFS referral regarding one prospective adoptive parent had been determined to be unfounded, but the investigation had delayed the completion of the home study.

8

On December 18, 2012, the juvenile court found that T.H., Ciara H., and C.H. were both generally and specifically adoptable. The court terminated parental rights and freed the children for adoption. The children's father, W.H., appeals.

## DISCUSSION

"At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan." (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that the minor is likely to be adopted within a reasonable time if parental rights are terminated. (§ 366.26, subd. (c)(1); *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1204.) "The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.]" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) Review of the juvenile court's finding of adoptability is limited to determining whether it is supported by substantial evidence. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.)

W.H. argues that the children were neither generally nor specifically adoptable, but we need not consider the general adoptability of the children because substantial evidence supports the juvenile court's conclusion that they were specifically adoptable. All three children were generally healthy and intelligent, were developing appropriately, and were cheerful, friendly, and trusting. They had been exposed to great violence, fear, abuse and neglect while in their mother's care, and they experienced emotional and behavioral problems as a result. Although they had multiple placements before being placed with their prospective adoptive parents, they were fortunate in having caregivers who had gone to great lengths in helping the children recover from the trauma they experienced. In stable placements with regular therapeutic care the children made great progress in healing, and they were active participants in their therapy and recovery.

9

At the time of the adoptability determination, each of the three children was living with her prospective adoptive parent, and had been placed with her for substantial periods of time. T.H. had been living with R.W. for nine months, and C.H. had been living with R.W. for 10 months. Ciara H. had been placed with her prospective adoptive parent for more than one and one-half years. The prospective adoptive parents were fully aware of the challenges and behavioral problems the children faced, and they were working with Wraparound service providers to address them. Each of the children, moreover, had made substantial progress in addressing her specific constellation of emotional and behavioral challenges while in her placement. Both caregivers were fully committed to permanently caring for the children, and they ensured that the girls received all the therapeutic, medical, and academic services that they needed. The girls were happy in their homes.

This evidence is sufficient for the juvenile court to have concluded, as it did, that based on their age, physical condition, and emotional state, as well as the existence of prospective adoptive parents, it was likely that T.H., Ciara H., and C.H. would be adopted. (§ 366.26, subd. (c)(1); *In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M.*, *supra*, at pp. 1649-1650.)

W.H. contends that the fact that the home studies had not been completed and approved at the time of the permanent plan hearing constitutes a legal impediment to adoption.[3]  The law is to the contrary. "[W]here there is no evidence of any specific

---

[3]     W.H. has requested that we take judicial notice of documents filed by DCFS in February 2013 that state that the home studies were not then completed. Our judicial notice of the August 2013 minute order establishing that the home studies remained

10

legal impediments to completing the adoption process, parental rights may be terminated to a specifically adoptable child regardless of whether a home study has been completed." (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1410.)

*In re B.D.* (2008) 159 Cal.App.4th 1218, on which W.H. relies to support his argument that the absence of a completed home study is a legal impediment to adoption, does not stand for the principle that a child cannot be determined to be adoptable until a home study is complete. In *In re B.D.*, the evidence to support the adoptability finding came from a database in which a certain number of parents were matched with the children by their characteristics, and the social services agency contended that the number of families interested in adopting the children individually and in groups supported a finding that the children were generally and specifically adoptable. (*Id.* at pp. 1232-1233.) The agency had identified one family that had expressed an interest in adopting a sibling group, but because that family did not have an approved adoptive home study, the social worker could not provide specific information to the family about the children and could only speak about them and their behavioral issues in hypothetical terms. (*Id.* at p. 1233.) There had been no preliminary assessment of the prospective home, and accordingly, there had been no social history taken of the adults in the home, no screening for criminal records and prior referrals for child abuse and neglect, and no assessment of the family's capacity to meet the minor's needs. (*Id.* at p. 1233 & fn. 6.) The social worker could not provide information about the children to the prospective adoptive family, facilitate contact between the children and the prospective adoptive family, or place the children in a preadoptive placement with the prospective adoptive family. (*Id.* at pp. 1233-1234.) Under such circumstances, the court found that "the absence of a foster care license or a preliminary assessment constitutes a legal impediment to adoption." (*Id.* at p. 1233.) Because of this obstacle, and because in *In re B.D.* the children had no previous relationship with a family interested in adopting them, the evidence did not support a determination that they were adoptable. (*Id.* at p. 1234.)

incomplete at that time makes it unnecessary to take judicial notice of earlier documents reflecting the same information.

While both here and in *In re B.D.*, *supra*, 159 Cal.App.4th 1218, no home studies had been completed, in all other respects the cases are different. In *In re B.D.*, the prospective adoptive parents had no foster care license and no preliminary assessment had been performed, and that was an obstacle to adoption. Here, in contrast, the girls had been placed with their prospective adoptive parents for many months. Unlike *In re B.D.*, the prospective adoptive parents here were not expressing an interest in adopting the children based on hypotheticals and vague descriptions of the children by a social worker, nor were they forming a desire to adopt in the absence of contact with the children. They were already living with and raising the girls, obtaining services for them, providing stable home environments for them, and working with service providers to help the children heal from their past trauma. While caring for the children they had become committed to becoming permanent caregivers for T.H., Ciara H., and C.H. Accordingly, by its own terms, *In re B.D.* does not apply here. While we share W.H.'s concern that the home studies have not been completed, he has established no error in the court's determination that the children were adoptable.

## DISPOSITION

The order is affirmed.


ZELON, J.


We concur:



PERLUSS, P. J.                          WOODS, J.

12