Filed 2/20/14  In re A.M.CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | B249854 (Los Angeles County Super. Ct. No. CK97676) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>A.M., et al.,<br><br>        Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Carlos Vazquez, Judge.  Affirmed and remanded.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant A.M.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant R.G.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Senior Deputy County Counsel, for Plaintiff and Respondent.

A.M. (father) and R.G. (mother) appeal from a May 15, 2013 order declaring their son[1] a dependent of the court under Welfare and Institutions Code section 300, subdivision (b).[2] Parents contend the court committed error when it (1) found jurisdiction under section 300, and (2) ordered the child removed from parents under section 361. Mother further contends the court failed to ensure notice as required under the Indian Child Welfare Act (ICWA). We affirm the court's jurisdictional findings and dispositional orders and remand for additional orders directing the Department of Children and Family Services (Department) to comply with ICWA.

## STATEMENT OF FACTS AND PROCEDURE

On January 1, 2013, Junior's 26-day-old younger sister was taken to the hospital and pronounced dead. The physician who attended to Junior's younger sister told social workers that the infant was pronounced dead at 12:01 p.m. and appeared to have been dead for 8 to 12 hours upon arrival at the hospital. The doctor said the child exhibited no signs of trauma and appeared to be fairly well taken care of, but her diaper was full with excessive urine and stool, as if no one had changed her for a long time. Mother had difficulty recalling what times the infant had been fed the night before. Mother and father claimed the infant was last fed and changed at 5:00 a.m. and was still sleeping when mother and father left the house around 9:30 a.m. to run errands. According to mother, she checked on the infant around 9:00 a.m. and she appeared to be breathing. Parents left the sleeping infant in a bassinet or infant seat on maternal great aunt's bed. When maternal great aunt's 16-year-old daughter went to hold the baby later that morning, she knew something was wrong and called maternal great aunt, who found the

---

[1] Father and son share the same first and last names. Consistent with mother's brief, we will refer to son as "Junior" in this opinion.

[2] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

2

baby pale with blue lips. She began doing compressions on the infant and directed the 16-year-old to call 911. Records show that the 911 call was placed at 11:38 a.m.

The same day as the infant's death, Denise Bertone, an investigator from the coroner's office, interviewed parents and visited the home, a small back house in a residential section of Los Angeles. Ms. Bertone described the family's living situation as "chaotic" and "impoverished." The home was dirty with cockroach nests and Chihuahuas defecating around the home. The family had all the signs and symptoms of "profound poverty." The infant had slept in a crowded room with no safe place for a baby and was later placed on a bed while still in a infant seat or bassinet, which is not safe. It appeared that the baby was not checked on frequently. There was grime on the infant's neck and underarm, and her diaper was heavy, contained urine that was brown in color, and smelled of urine and waste. The investigator also found pink polyester·pajamas at the bedside which smelled of "foul urine."

Social workers also visited the home on January 1, 2013, the day of the infant's death, and again on January 22, 2013. Mother, father, and Junior lived in a small two bedroom back house with at least eight maternal relatives. The adult residents were the maternal great aunt, her husband, maternal cousin and her husband, mother, and father. There were also four children living in the home, three children under the age of five and a sixteen-year-old. The Department observed the younger children to be healthy, appropriately dressed and groomed, and clean, save for dirty toenails and dirt on the bottoms of their feet. Junior had eczema on his skin. None of the children showed any signs of abuse or neglect. Parents acknowledged that there was some clutter because of children's toys scattered around the house.

Mother and father reported they were living with maternal relatives while they were saving money for their own home. They sleep on a bed on the floor in the living room of the house. There was a roach problem when parents moved into the house, but a pest control company had treated the home and was being called out again. Father worked at a warehouse, and mother stayed at home caring for the children. Mother was abused by her parents and was in foster care between the ages of seven and seventeen.

3

She was diagnosed with bipolar/depression as a minor and used methamphetamines, cocaine, and marijuana when she was 17. Mother denies any drug use after becoming pregnant with Junior. She was diagnosed with postpartum depression after Junior's birth but did not suffer postpartum depression after her daughter's birth. She did become depressed after the infant's death.

On February 6, 2013, the Department filed a petition alleging the circumstances of the infant's death, the filthy and unsanitary condition of the home, and mother's mental and emotional problems placed Junior at substantial risk of harm. The court ordered Junior detained.

The Department visited the home again on February 13, 2013, noting it was "dirty and in need of cleaning." The front door was off the hinges and held up by the side of the door that locks. The social worker also observed a bucket of water in the bathroom that could pose a safety hazard, as well as multiple roaches on the walls and floor. Both parents acknowledged the home needed cleaning and agreed to eliminate safety hazards such as the bucket of water and the broken door.

An investigator working for father's attorney testified he visited the family's home on February 20, 2013. During his visit, he did not observe any safety concerns, roaches, or dog feces. He also testified that some of the home's residents had moved out, and only six residents remained, including mother, father, maternal great aunt, and her two children. The investigator took photos of the home during his visit, showing the kitchen and the parent's sleeping area in the living room.

By April 10, 2013, the Department continued to express concern regarding the inappropriate nature of parents' residence. While the agency said there had been some improvement in the condition of the home, the mental health status of the adults in the home remained marginal, and returning Junior to his parents' custody would be detrimental.

On April 15, 2013, the coroner's final autopsy report identified the cause of the infant's death as "Sudden Unexplained Infant Death," referred to in the briefing as "SUDS." The autopsy report concluded: "The autopsy, scene investigation, and review

of birth records did not discover the cause of [the infant's] sudden expected [*sic*] death. No disease or injury was found. . . . [The infant's] nutritional state was not deficient by autopsy examination. The infant's sleep arrangements (an infant seat covered with a blanket and placed on a heavily cluttered bed) were unsafe. The home was cluttered, dirty, and chaotic, with a heavy cockroach infestation and adults coming and going. The home was unsafe for small infants because of the crowding, filth, and unsafe sleeping arrangements, but we were unable to establish that these circumstances caused or contributed to [the infant's] death. The cause of death remains unknown, and all possibilities remain open."

In its May 15, 2013 report, the Department stated the stove remained infested with roaches, but Family Preservation Services was arranging to provide a new stove in connection with a separate dependency proceeding involving maternal great aunt's children. Despite the coroner's findings that the condition of the home did not cause the infant's death, the Department asserted that it would be detrimental and against Junior's best interests to return to the home. There were some improvements to the condition of the home, but "it remains borderline with regard to child safety (cockroaches, dirty etc.) Parents occupy the living room and are content with the "temporary" living arrangement. They appear to be unmotivated." Parents are unable to move because they have no income. Father was no longer working at the warehouse and was looking for work.

The foster mother observed that Junior had poor eating habits, sometimes waking up to drink milk every hour and overeating to the point of nausea and vomiting. Other times, he would cry for more food even after being fed and did not want to eat healthy snacks. Foster mother reported that parents would give Junior candy, fries, burgers, and soda during visits, calling their parenting skills into question. Mother had been diagnosed with depressive disorder and prescribed medications. Mother reported that she was no longer taking the medications because the doctor had taken her off them, but she also reported taking them to help her sleep. Father had not participated in a court-ordered evaluation, and neither father nor the Department offered any explanation for the failure to do so. Parents had enrolled in a 10-week parenting class but only attended three weeks

of the class.

The Department's May 15, 2013 report also described the mental health status of the other adults in the home as "somewhat marginal." Maternal great aunt admitted having hallucinations, depression, and trouble controlling violent behavior during her lifetime. She said she was abused as a child and was physically and sexually abused while in foster care. She had been diagnosed with Bipolar Disorder, "slight psychosis," and Post Traumatic Stress Disorder after she was victimized by domestic violence in a former relationship. She admitted previously smoking "primos" (cocaine and methamphetamine), but claimed she had not used drugs for about 11 years. She reported taking psychotropic medication until her psychiatrist stopped the prescription a year earlier.

Maternal great uncle was diagnosed as being schizoaffective and was taking psychiatric medications Paxil, Respirodol, and Klonopin. He has a lengthy criminal record with multiple drug-related arrests and convictions, including a conviction in 2010 for willful cruelty to a child. Maternal great uncle had also failed to comply with court orders to obtain services for anger management, parenting, and drug rehabilitation in connection with a 2009 dependency case.

At the jurisdiction hearing on May 15, 2013, the court admitted the Department's reports into evidence and heard testimony from an investigator working for father's attorney. During argument, mother's counsel asked the court to consider ordering voluntary services under section 360, subdivision (b), pointing out that parents had already suffered the loss of their daughter and were open to obtaining services. The court struck allegations relating to the circumstances of the infant's death and mother's mental health but sustained the following allegation, amended to strike a reference to dog feces: "On 1/16/2013, the child [Junior's] home was found to be in a filthy and unsanitary condition including an infestation of cockroaches and cockroach nests throughout the child's home. The child's deceased sibling . . . had a dirty body, dirty clothing and a dirty diaper. Such a filthy and unsanitary home environment established for the child and the sibling by [mother] and [father] endangers the child's physical health and safety and

6

creates a detrimental home environment, placing the child at risk of physical harm, damage, and danger." The court stated it was "persuaded by preponderance of the evidence that the home is unsafe for a young child such as an 18-month-old at this time, and there are issues that have to be addressed -- safety issues before that child can be safely returned to the parents."

At disposition, counsel for parents repeated their request for voluntary services under section 360, subdivision (b), and also pointed out the higher burden of proof, that if the court did not intend to return Junior to parental custody, it must find by clear and convincing evidence that the condition of the home posed a risk to Junior at the time of disposition. The court acknowledged the higher standard and found that it had been met, stating: "I do have very serious concerns about the safety hazards that could be posed to the child." The court ordered reunification services for parents, including family counseling, and ordered a progress report in three months to see if the home conditions had changed. It also admonished parents that they had six months to reunify with their child, and if they failed to complete the case plan, the court could set a hearing at which their parental rights could be terminated. The court stated: "I don't say that to scare you, but I want you to be well aware that from the get-go, you got to cooperate with the department, and you got to do everything in your power to make sure that you can provide a home which is safe for your second child."

## DISCUSSION

### Standard of Review

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.]" (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) We uphold the jurisdictional findings, "if after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is substantial

7

evidence to support the findings." (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378.) We resolve all conflicts in support of the determination, examine the record in a light most favorable to the dependency court's findings and conclusions, and indulge all legitimate inferences to uphold the court's order. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379; *In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734.)

**<u>Jurisdictional Findings</u>**

Parents contend substantial evidence does not support the dependency court's jurisdictional findings under section 300, subdivisions (b) and (j). We disagree.

Section 300, subdivision (b), provides a basis for jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." In order to establish jurisdiction under subdivision (b) of section 300, there must be evidence of (1) neglectful conduct by the parent; (2) causation; and (3) serious physical harm or illness to the minor, or a substantial risk of such harm or illness. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) Standing alone, unsubstantiated speculation of possible future risk cannot support jurisdiction. (*In re R.M.* (2009) 175 Cal.App.4th 986, 988.)

Parents contend there was insufficient evidence to support a finding of risk as to Junior. The coroner's report about the death of Junior's infant sister pointed to the crowded and unsanitary condition of the home as a cause for concern, but concluded that they did not cause her death. Parents argue that relying on the condition of the home, the only housing parents could afford, as evidence of risk to Junior is speculative and serves as a proxy for the family's poverty as the basis for exercising jurisdiction.

8

We recognize that the original facts that brought this family to the Department's attention in January 2013 cannot provide the basis for exercising jurisdiction in May 2013, after the coroner's report identified SUDS as the cause of death of Junior's infant sister. The home, although not as filthy as observed in January, remained dirty enough in May to be considered borderline with regard to child safety and had a broken window in the kitchen. Cockroaches were still observed, despite multiple attempts to address the problem. Just because the condition of the home was ruled out as a cause of an infant's death does not preclude the court from considering the evidence of similar and continuing problems in support of a finding that another child in the home is at substantial risk of harm. At least three of the adult residents suffered from serious mental health issues that could amplify the documented safety risks. Parents' financial condition may have prevented them from moving out. However, it was still reasonable for the court to infer that parents could have, but did not, take other steps to make their existing home safer for their only remaining child. These facts constitute substantial evidence supporting the jurisdictional finding under section 300, subdivision (b).

**Dispositional Order**

Parents contend the order removing Junior under section 361, subdivision (c)(1) must be reversed. They argue substantial evidence does not support the finding Junior was at substantial risk of harm, and the court did not consider reasonable alternative means to protect him. We disagree.

Before a child can be removed from parental custody, the Department must prove, by clear and convincing evidence, "[t]here is or would be a substantial danger to [the child's] physical health, safety, protection, or physical or emotional well-being if [the child] were returned home" and removal is the only reasonable means of protecting the child's physical health. (§ 361, subds. (c)(1), (d).) "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child. [Citation.]' [Citations.]" (*In re Miguel C.*

9

(2011) 198 Cal.App.4th 965, 969.)  The "clear and convincing evidence" standard is a very high standard, requiring evidence that establishes a high probability and leaves no substantial doubt.  (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205.)  We review a dispositional order removing a child from a custodial parent for substantial evidence.  (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

In making its jurisdictional findings, the court had already determined the home was unsafe.  In support of its disposition, it stated on the record it was finding "by clear and convincing evidence that there is a substantial danger to the child if he were to be returned home at this time to his physical and emotional health, that there are not reasonable means by which the child's physical and emotional health can be protected without removing the child from the parent's home."  We conclude the court's decision is supported by substantial evidence for the same reasons stated earlier.

Parents argue the court erred in finding there were no reasonable alternatives to removal, pointing out that the court denied a request for a contract under section 360, subdivision (b), which would permit the Department to provide services to the family but would return the child.  However, parents had already failed to comply with an earlier court order to complete a 10-week parenting class, and father had failed to participate in a psychiatric evaluation.  These facts, taken along with the Department's observation that parents appeared "unmotivated" to change their living situation, provide substantial evidence for the trial court to have concluded that a voluntary agreement was not a reasonable alternative in this case.

Counsel for mother and father also raise the specter of possible termination of parental rights, cautioning that decisions about a child's removal from parental custody should not be influenced by class and lifestyle biases and that "indigency, by itself, does not make one an unfit parent." (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212 [lower court erroneously terminated father's parental rights based solely on his financial inability to secure adequate housing].)  Here, we conclude that the reasons behind the court's order were based on safety concerns and not on poverty.  Although the court did not more directly tailor its disposition orders to address its safety concerns, this court

assumes the dependency court will require, and the Department will provide, adequate reunification services, including targeted assistance to either address the safety issues or help the family identify and obtain subsidized alternate housing.

## ICWA Findings

Mother contends the Department failed to comply with the notice requirements of ICWA and so the matter must be remanded with directions to provide adequate notice. She further argues that the jurisdiction and disposition orders must be reversed because the court had reason to know that Junior is an Indian child, and therefore should have applied a different standard of proof to its dispositional orders. The Department concedes that remand is necessary for proper ICWA notices, but they argue there is no need to reverse the jurisdictional and dispositional orders. We agree with the Department.

"In 1978, Congress passed [ICWA], which is designed to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.' [Citations.]" (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 734, quoting 25 U.S.C. § 1902.) "ICWA provides 'where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings, and of their right of intervention.' (25 U.S.C. § 1912(a).)" (*In re Damian C.* (2009) 178 Cal.App.4th 192, 196.) To satisfy the notice provisions of ICWA and provide a proper record of such notice, the Department must first "identify any possible tribal affiliations and send proper notice to those entities[.]" (*In re Marinna J., supra,* at p. 739, fn. 4.) "The notice must include the names of the child's ancestors and other identifying information, if known, and be sent registered mail, return receipt requested."

11

(*In re Brooke C.* (2005) 127 Cal.App.4th 377, 384.)  Next, the Department must file with the court copies of the notices sent, the returned receipts, as well as any correspondence received from the tribes.  (Cal. Rules of Court, rule 5.482(b); *In re Marinna J.*, *supra*, 90 Cal.App.4th at pp. 739-740, fn. 4.)

On February 6, 2013, the court ordered the Department to investigate mother's potential Indian heritage and to notice the appropriate tribes.  Maternal great aunt provided names and dates of birth for Junior's paternal grandfather, maternal grandmother, maternal great grandmother, and maternal great-great grandmother, as well as the name of the maternal great-great grandfather.  Mother and maternal great aunt knew of no family member who had received tribal services.  On April 9, 2013, the Department notified three Cherokee Tribes, the Blackfeet Tribe of Montana, the Bureau of Indian Affairs, and the Secretary of the Interior of the May 15, 2013 jurisdictional hearing.  On April 25, 2013, the Department received a letter from the Cherokee Nation indicating the information it received was incomplete and it needed the names and dates of birth of the child's maternal great-great-grandparents, the child's paternal grandparents, great-grandparents, and great-great-grandparents in order to verify the heritage claim.

The Department's efforts to comply with ICWA's notice requirements in this case fell short.  The notice completed by the Department contained multiple errors, omitting the names of three ancestors whose names were known, misspelling great-grandfather's name, and omitting maternal grandmother's middle name.  The Department did not file return receipts with the court, and at least one tribe asked for additional information but the record does not show whether the Department sought to provide the requested information.

Although the matter must be remanded to ensure compliance with ICWA's notice requirements, we need not reverse the disposition order removing Junior from parental custody because there has not yet been a sufficient showing that Junior is an Indian child.  If a tribe later determines that Junior is an Indian child, "the tribe, a parent or [the child] may petition the court to invalidate an action of placement in foster care or termination of

12

parental rights 'upon a showing that such action violated any provision of sections [1911, 1912, and 1913].' (25 U.S.C. § 1914.)" (*In re Damian C*, *supra*, 178 Cal.App.4th at p. 200.)

**DISPOSITION**

The dependency court's jurisdictional findings and disposition orders are affirmed. The case is remanded with directions to comply with the requirements of ICWA.

KRIEGLER, J.

We concur:

TURNER, P. J.

MINK, J.*

---

\* Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.