[No. D035422. Fourth Dist., Div. One. Nov. 20, 2000.]

In re JEROME D., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
LADAWN P. et al., Defendants and Appellants;
JEROME D., Appellant.

## COUNSEL

Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Defendant and Appellant LaDawn P.

Linda M. Fabian, under appointment by the Court of Appeal, for Defendant and Appellant Jim D.

Mary Elizabeth Handy, under appointment by the Court of Appeal, for Appellant Jerome D.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, Gary Seiser and Kathryn E. Krug, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**McDONALD, J.**—The juvenile court terminated the parental rights of LaDawn P. (Mother) and Jim D. (Father)[1] to their child, Jerome D. (Jerome), finding Jerome adoptable and declining to find that he would benefit from a continued relationship with Mother (Welf. & Inst. Code, § 366.26, subd. (c)(1)(A)).[2] Immediately after terminating parental rights, the court granted Mother's modification petition (§ 388) seeking unsupervised visits. The next day, the court vacated the visitation order. Jerome, Mother, and Father appeal.

All three appellants contend the court erred by not finding Jerome would benefit from a continued relationship with Mother and by vacating its visitation order. Additionally, Jerome and Mother contest the adoptability

---

[1] Throughout these proceedings, Father was imprisoned in Tennessee.
[2] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

finding, Mother asserts the court should have decided her modification petition before the section 366.26 matter, and Jerome argues exceptional circumstances mandated selection of a permanent plan other than adoption. We conclude that the court erred by finding Jerome adoptable and by not finding a benefit to him from a continuing relationship between Jerome and Mother. We accordingly reverse the judgment terminating parental rights.

BACKGROUND

Jerome was born in May 1991 when Mother was 16 years old. In October 1997, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition because Jerome had a large burn in the shape of an iron on his buttocks. Jerome was detained in Polinsky Children's Center, then detained and later placed with a relative. Mother's visits were supervised.

On February 23, 1998, Jerome was placed with Mother's former boy-friend, J. D. E. (Mr. E.). Also living with Mr. E. were Mr. E. and Mother's son and daughter, Dominique and Jasmin E., Jerome's younger half siblings. Mr. E. and Mother had a history of domestic violence in the children's presence, resulting in three convictions of Mr. E. Despite having completed domestic violence treatment in 1993 and again in July 1997, he was arrested on October 13, 1997, for battering Mother and violating a restraining order. His criminal case was diverted and on November 25 he re-enrolled in the domestic violence program. He was also "listed as a perpetrator" with Child Protective Services (CPS) for emotionally abusing his nephews and niece in November 1995.

After Mother and Mr. E. separated, she entered into a relationship with John M. (Mr. M.) that was also violent, and she and Mr. E. began a lengthy custody dispute over Dominique and Jasmin. Mother and Mr. E. also battled over custody of Jerome, who suffered emotionally from the conflict. Despite Mother and Mr. E.'s difficulties with each other, the Agency allowed him to supervise her visits with Jerome, left some of the visitation scheduling to Mother and Mr. E., notwithstanding orders that it arrange visits, and apparently set up other visits with Jerome for times when Mother was unavailable.

After Mr. E.'s October 1997 arrest for battering Mother, he told the police that she had intentionally burned Jerome with an iron. On May 10, 1998, Mother was arrested. She was convicted of child abuse (Pen. Code, § 273a, subd. (a)), placed on five years' probation, incarcerated on September 21, and released on April 2, 1999. She participated in reunification services and eventually expressed remorse for abusing Jerome.

At the June 4, 1999, 18-month review hearing, the court set a section 366.26 hearing. On November 8, Mother filed a section 388 modification petition, requesting that Jerome be placed with her. The petition was later amended to seek unsupervised visitation rather than placement.

The combined section 366.26 hearing and the hearing on Mother's section 388 modification petition began on November 17, 1999. On December 3, the court declared a mistrial because a social worker in the audience attempted to coach the testifying social worker. It also granted Mother unsupervised visitation. At a December 15 special hearing, the Agency requested that Mother's visits again be supervised. A juvenile court referee ordered unsupervised daytime visitation and allowed the social worker discretion to permit overnight visits. At another special hearing on December 30, the court reiterated a March 10, 1998, no-contact order between Jerome and Mr. M.

The section 366.26 hearing and Mother's section 388 modification petition hearing reconvened on January 24, 2000. That day, the court ordered unsupervised visitation for Mother, with no contact between Jerome and Mr. M. The section 366.26 hearing concluded on April 4, and the court found Jerome adoptable, terminated parental rights, and referred him for adoption. It then granted Mother's section 388 modification petition, ordering unsupervised visits between Mother and Jerome until further order of the court and allowing contact between Jerome and Mr. M.

At a special hearing on April 5, 2000, the Agency asked the court to reconsider the April 4 visitation order because after Mother's parental rights were terminated, she had no right to visitation. Jerome's counsel argued that ending visits would devastate Jerome and that if the court modified the visitation order, it should find him not adoptable or difficult to place for adoption and continue the matter to ensure that Mr. E. would adopt him. Mother joined in this argument. Father argued that ending visits would be detrimental to Jerome and would victimize him because Mother would still have visits with Dominique and Jasmin, but no right to visit Jerome. The court acknowledged that it had made a mistake of law and vacated its order allowing Mother to visit Jerome.

### ADOPTABILITY

■ The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. (§ 366.26, subd. (c)(1); *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223 [4 Cal.Rptr.2d 101].) According to the Agency's

assessment,[3] Jerome was adoptable "based on his good mental health, physical health, and sociability." The assessment further stated, "[h]e appears to be doing well in school, and currently requires no special treatment. Jerome has lived with his stepfather and stepsiblings for the majority of his life, and it would be detrimental to remove him from this family. [Mr. E.] has expressed his desire to adopt Jerome and has filled out the initial adoption application. An applicant worker has not yet been assigned. Jerome's mother informed this worker that in the event her rights are terminated, she would strongly desire for Jerome to continue residing with [Mr. E.] and his siblings." Mr. E.'s home study, which the Agency did not intend to initiate until parental rights were terminated, was to include "a criminal and social assessment to determine that there are no child-related referrals or concerns." At the section 366.26 hearing, the social worker testified that "the applicant worker . . . reported that she saw no reason why this home study would not be approved." On August 24, 2000, the Agency filed a report stating that "the written portion of [Mr. E.'s] adoptive home study . . . has successfully been completed, and upon return of fingerprints from the state and one character reference, approval will be granted."

It is clear that the finding of adoptability here was based on Mr. E.'s willingness to adopt. Although the assessment briefly referred to Jerome's "good mental health, physical health, and sociability," it did not say whether there were any approved families willing to adopt a child of his "age, physical condition, and emotional state." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82]; *In re Jennilee T., supra*, 3 Cal.App.4th at pp. 223-225.) Moreover, the assessment did not consider Jerome's close relationship with Mother, discussed below, or his prosthetic eye, which apparently required care and treatment.[4] There was insufficient evidence of general adoptability to support the finding.

Mr. E.'s desire to adopt Jerome was not sufficient to support the adoptability finding. Although the assessment, written on September 2, 1999, said that Mr. E. wished to adopt, it did not address his criminal and CPS history as required by section 366.22, subdivision (b)(4).

" ' "Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]' " (*In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065 [280 Cal.Rptr. 503], quoting *In re David C.* (1984) 152 Cal.App.3d 1189, 1208

---

[3]Unfortunately, our copy of the assessment is extremely difficult to read because portions of the original were apparently marked with a highlighting pen.

[4]Jerome's eye had been removed when he was two years old due to glaucoma.

[200 Cal.Rptr. 115].) The evidence of adoptability here does not meet this standard.

### BENEFICIAL RELATIONSHIP

■ Section 366.26, subdivision (c)(1) allows termination of parental rights upon clear and convincing evidence of adoptability. An exception exists if "[t]he parents . . . have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(A).) A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535].) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id.* at p. 576.)

■ Here, Mother, Father, and Jerome all argue that the beneficial relationship exception applies to Mother. The court found that she had maintained regular visitation and contact and that her relationship with Jerome was parental. It concluded, however, that "continuing the . . . relationship . . . would not promote [Jerome's well-being] to such a degree as to outweigh the well-being [he] would gain in a permanent home with new adoptive parents." It observed that Mother "was not honest on the stand," Mr. E. "was not . . . completely candid with the court" and "was biased," and Mr. M. "in a couple of spots kind of glosses over some history." The court found that the social worker's testimony was "undercut . . . by her absolute reliance on Mr. [E.]" and her failure to recognize his bias, and the testimonies of child's counsel's investigator Brenda Hall and child's counsel's legal intern Jenny Kim were "very close to the only unbiased testimony that I received in this trial."

Hall testified that when she visited Jerome in Mr. E.'s aunt's home in September 1999, he seemed lonely, sad, and the stepchild or "the odd child out" in Mr. E.'s home. Jerome told Hall that he did not spend much time at Mr. E.'s home or get to see Mr. E. much; he was at his aunt's home for considerable periods, and he had no after-school activities. He smiled, however, when he said he wanted to live with Mother. Hall noticed that Jerome's prosthetic eye was leaking and asked him when he had last seen the doctor. He said he could not remember. During Hall's December 15 visit with Jerome at Mother's home, Jerome was "all smiles," "very talkative," and "outgoing" and he and Mother were "very loving" with each other.

Mother had had difficulty picking up Jerome for this visit because Mr. E. had instructed Jerome's school not to release him to her.

Kim testified that when she visited Jerome in Mother's home on January 28, 2000, he seemed happy, he said he liked visiting Mother and would be sad if visits were suspended, and he and Mother seemed to share a "normal mother/son relationship." Mother had arrived late for this visit, apparently explaining that she had tried to pick up Jerome but he was not at Mr. E.'s home. In Kim's presence, Mother paged Mr. E. and received no return call, but when Kim paged him, entering her cellular telephone number, he called back and then brought Jerome to Mother's home for the visit.

Examining the evidence in the light most favorable to the judgment, we conclude there is insufficient evidence to support the determination that Mother did not meet her burden of showing a beneficial relationship. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 576-577; *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373 [8 Cal.Rptr.2d 342].) At the time of the section 366.26 hearing, Jerome was nearly nine years old. He had lived with Mother for the first six and one-half years of his life and expressed his wish to live with her again. For at least two months, he had been having unsupervised overnight visits in her home. He called her "mom" or "mommy." There was apparently no woman in his life other than Mother with whom he had a beneficial relationship.

Psychologist Raymond Murphy observed Jerome and Mother together in her home in October 1999. Dr. Murphy concluded that Jerome "identifie[d] her as mother" and they shared a "strong and well[-]developed" parent-child relationship and a "close attachment" approaching a primary bond. He believed that if Jerome were placed with Mother, this bond would increase "depending on the extent of the placement and [Mother's ability] to provide care on a daily, regular basis." Dr. Murphy noted some affection between the two, relatively effective communication, and "no indications of unusual behaviors, unusual anxieties or distresses." He observed that Mother tried to meet Jerome's needs "both recreationally and in a nurturing fashion" and practiced "good boundary setting." He opined that if the relationship were severed Jerome would grieve and could experience emotional and behavioral difficulties, and that continued contact would benefit him developmentally. Dr. Murphy could not say whether Jerome's stability would be affected if he lost contact with Mother.

The above testimony shows the positive effect of interaction between Jerome and Mother. Indeed, the court characterized their relationship as "parental." Jerome wished that relationship to continue and was entitled to

have the court consider his wishes. (§ 366.26, subd. (h).) There is no evidence that the security and stability of his placement with Mr. E. would have been jeopardized if Mother's parental rights had remained intact. A permanent plan of guardianship or long-term foster care would have allowed Jerome to remain in that home yet maintain his relationship with Mother. It would have prevented his position as the odd child out in Mr. E.'s home from becoming entrenched by a cessation of visits and the loss of his mother while Dominique and Jasmin continued to enjoy visits and remained Mother's children. Additionally, the court's finding that Jerome would not benefit from a continued relationship with Mother is inconsistent with its immediately ensuing order allowing unsupervised visits between Mother and Jerome.

We recognize that Mother has serious shortcomings as a parent, the most obvious being her act of cruelty in intentionally burning Jerome with the iron. Mr. E., however, also has serious shortcomings as a caretaker, including his violence toward Mother in the children's presence. As the juvenile court observed, this is a difficult case, made more so by the apparent lack of candor of some of the principal witnesses. Most troubling is the social worker's tendency to overlook Mr. E.'s deficiencies although criticizing Mother for trivial matters, a theme throughout much of this case that bears further explication.

The social worker claimed that Mother bought Jerome gifts to gain his attention, "maybe trying to bribe" him. These gifts included clothing. On cross-examination, Jerome's counsel asked, "And do you think it's a parental act for a parent to buy clothing for their child?" The social worker answered, "To some extent." When the social worker testified that Mr. E. paid for Jerome's clothing, she did not characterize this as a gift or a ploy for attention, and did not so characterize the various social activities that Mr. E. offered Jerome.

The assessment criticized Mother for picking up Jerome to hug him at two separate August 1999 visits, noting he was "obviously too big and heavy to be picked up for a hug." The assessment later said that Mr. E. "appears very attached to Jerome" and described their home as "loving, caring, and supportive," yet did not mention any physical show of affection by Mr. E. for Jerome.

According to the report of the family court counselor assigned to Mother and Mr. E.'s custody case regarding Dominique and Jasmin, Mother asked "to have the children on alternating weekends, from Saturday to Sunday, and other times during the week" but Mr. E. "objected to any overnight stay."

The social worker reported, however, that in the custody matter Mother had "requested . . . visits on alternate Sundays or alternate weekends even though she was offered to have them every weekend." The social worker gave the counselor information about Jerome's dependency case, apparently omitting any negative facts about Mr. E.

The social worker unequivocally denied that Mr. E. interfered with Mother's visitation. Then, after admitting that "[m]aybe on a few occasions" Mother had complained that Mr. E. was denying her access to Jerome, the social worker claimed that Mother had requested visits "late at night, or . . . at different times when it wasn't appropriate for a visit," Mr. E. "does have full custody," and "[s]ometimes, there were some misunderstandings because I had not been able to contact [Mr. E.] through [Mother] to set up a visit." According to the social worker, "probably 99 percent of the time, [Mr. E.] has been cooperative." She accepted without question his representations concerning visitation, believed he was objective, and denied he had any bias against Mother or Mr. M.

Mother called the social worker on several occasions and asked to be involved in Jerome's medical treatment. Although the Agency had allowed Mr. E. to supervise Mother's visits with Jerome, the social worker refused these requests on the ground "it's probably best that she not be present when Mr. [E.] is present and Jerome." At the same time, the social worker called Mother a "friendly visitor" rather than a parent.

CONCLUSION

In view of our determination that the judgment terminating parental rights must be reversed based on insufficient evidence to support the findings of adoptability and no benefit from a continuing relationship between Jerome and Mother, we need not discuss Father's standing or Jerome's contention that exceptional circumstances mandated selection of a permanent plan other than adoption. We also need not address in detail the contentions that the court erred by vacating its visitation order and postponing a decision on Mother's modification petition until after its decision on the section 366.26 permanent plan issue. The court should have perhaps first decided the modification matter, which had been pending for nearly five months. Had it done so, it would not have proceeded to find there was no beneficial relationship and terminate parental rights; termination of Mother's parental rights would have been inconsistent with the modification petition ruling that continued unsupervised visits and rescinded the requirement that Mr. M. have no contact with Jerome. Proceeding in this manner would have also obviated the need for a subsequent hearing to vacate the visitation order.

## DISPOSITION

The judgment terminating the parental rights of Mother and Father is reversed. The matter is remanded to the juvenile court for a new section 366.26 hearing consistent with the views expressed in this opinion.

Benke, Acting P. J., and Nares, J., concurred.