Filed 1/31/14  In re D.H. CA3

### NOT **TO** BE **PUBLISHED**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re D.H., JR., a Person Coming Under the Juvenile Court Law. | C074367 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. No. JD232306) |
| Plaintiff and Respondent, | |
| v. | |
| D.H., SR., | |
| Defendant and Appellant. | |

D.H., Sr. (father), appeals from the juvenile court's order terminating parental rights.  (Welf. & Inst. Code, § 366.26.)[1]  He contends insufficient evidence supports the predicate finding that the minor, D.H., Jr. (the minor), is adoptable.  We shall affirm.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2012, the Sacramento County Department of Health and Human Services (Department) filed a section 300 petition as to the minor (born in October 2010). The petition alleged that father was incarcerated in Deuel Vocational Institution and mother (N.T.) was a homeless methamphetamine addict who had dropped off the minor with the minor's godfather, then failed to remain in contact with him or provide for the minor. The detention report further alleged that mother's whereabouts were unknown and father would remain incarcerated until 2014.

At the contested jurisdictional/dispositional hearing in August 2012, the juvenile court sustained the section 300 petition, ordered the minor placed in foster care, and ordered reunification services for mother but not for father.

The January 2013 six-month status review report proposed terminating mother's services because she had not engaged in services or visitation and her whereabouts remained unknown. The minor had developmental delays, including significant speech delays, for which he was receiving assistance; he was also receiving therapy because he struggled to express his feelings and needs and was displaying sleep disruption, severe tantrums, and gorging. A recent placement change had caused him to regress and he was still having difficulty adjusting to the new placement, but was improving slightly week by week. Despite the minor's problems, the Department considered him adoptable and recommended adoption as the permanent plan.

In January 2013, the juvenile court terminated mother's services and set a section 366.26 hearing for May 2013. The court directed the Department to assess whether adoption or some other permanent plan would be most appropriate.

The section 366.26 report, filed in April 2013, called the minor "generally adoptable" despite "some behavioral problems and a speech delay." He had "no diagnosed mental handicap" and was "making significant improvements in his

2

behaviors." He was "doing exceptionally well in the care of his adoption homestudy approved family," with whom he had been placed since December 2012. They saw to it that all of his needs were met. He was happy and "ha[d] made a very good adjustment to his caretakers and environment." The likelihood of his adoption was "excellent."

When assessed in June and July 2012, the minor was found to be "at age level for cognition, delayed approximately 6 to 8 months for speech, and slightly above age level for fine and gross motor development and for self[-]help skills." Since then, he had made "good developmental progress"; his "language skills ha[d] increased tremendously and he ha[d] a vocabulary of approximately 80 words" (as compared to the "developmental milestone for an average two year old" of about 300 words). His physical development was on track. He still had disturbed sleep, but could fall back to sleep after being reassured by his caretakers.

The minor continued to receive weekly in-home Parent Child Interactive Therapy services to improve his frustration tolerance and the parent-child relationship. He had responded well, with a decrease in tantrums, food hoarding, and gorging. However, frequent changes of therapists had caused him to regress in the past.

Previous foster parents had described the minor as "sad," with possible "attachment issues." Now, however, he smiled often and enjoyed new experiences. He was caring and helpful, got along well with other children, and had started in a soccer league for children in his age group.

At the contested section 366.26 hearing in June 2013, the juvenile court stated: "It appears that this very young child is generally adoptable with no exceptions that would make him in any way difficult to be adopted by anyone." Father's counsel argued that the minor was not likely to be adopted, citing the minor's diagnoses of "abnormal health and development, speech delays, [and] language delays," his need for "early intervention services," his "problems with food and hoarding behaviors," his "tantrums," and his

3

possible continuing "attachment issues." Counsel objected to a finding of adoptability, to the choice of adoption as a permanent plan, and to the termination of father's parental rights. The juvenile court responded:

"It's very interesting when one hears the arguments regarding children's likelihood of adoption. And, generally, we are guided by looking at characteristics that perhaps maybe are realistic for most people [who] would not want to adopt this child. I'm not really sure that that's what the standard is under the law, and I don't know whether that's really been found.

"There is a home that has been willing to accept [the minor] into the home, to work with him, to love him, to guide him, to be everything a parent needs to be with a child. And they have not found that whatever characteristics he has makes him unadoptable to them. And that is evidence to the Court that at least one family who did not know [the minor] before finds him adoptable. If one family finds him adoptable, even with all of the problems that he had, and now that he has found a home with them and their work with him, his tantruming is less. He is easily deterred and calmed down. They take him to public places where he acts well-behaved. Even if his diagnosed developmental delays, developmental and social and emotional development problems have increased, it could be, and the Court would only be speculating, that it could easily be that what would be seen and diagnosed by the experts was really the result, not necessarily of his own delays or emotional problems, but the result of not being able to receive what he's been receiving in this home."

The juvenile court found that the minor was likely to be adopted, termination of parental rights would not be detrimental to him, and freeing him for adoption was in his best interest. The court ordered the termination of mother's and father's parental rights and chose adoption as the permanent plan.

4

Defendant contends insufficient evidence supports the finding of adoptability made by the juvenile court. We disagree.

"If the court determines, based on the assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).)

We review the finding that the child is likely to be adopted within a reasonable time under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.) That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.)

The determination of whether a child is likely to be adopted focuses first upon the characteristics of the child; therefore, a finding of adoptability does not require that the child already be in a prospective adoptive home. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) However, the fact that a prospective adoptive family has expressed interest in adopting the child is evidence that the child is likely to be adopted by that family or some other family in a reasonable time. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154; *Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1651.) The law does not require the juvenile court to find that a child is "generally adoptable" before terminating parental rights. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

Here, the Department called the minor "generally adoptable" and pointed to no characteristics which, in the Department's opinion, would make the minor difficult to place with prospective adoptive parents. The minor's placement with foster parents who

have indicated they wish to adopt him is strong evidence that he is likely to be adopted within a reasonable time. (*In re Lukas B.*, *supra*, 79 Cal.App.4th at p. 1154; *Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1651.) Thus, the minor's delays and emotional problems, all of which were significantly improved or improving as of the section 366.26 hearing, did not militate against adoptability.

Father reiterates the litany of the minor's problems, which father's trial counsel recited below. But father cites no authority holding that any of these problems would necessarily constitute an obstacle to adoption, and we know of none.

Father relies on *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205 and *In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065-1066 (*Amelia S.*), which he represents as holding: "The fact that persons have expressed an interest in adopting a special needs child is not by itself sufficient to show clear and convincing evidence that the child is adoptable." But neither decision actually so holds, and both are distinguishable on their facts.

In *Jerome D.,* which does not use the expression "special needs child," the juvenile court's finding of adoptability was based solely on the willingness of one foster parent to adopt, but a homestudy had not been done on him despite his known criminal and Child Protective Services history; nor had the adoption assessment considered the minor's close relationship with his mother, or the fact that he had a prosthetic eye, which required care and treatment. (*In re Jerome D.*, *supra*, 84 Cal.App.4th at p. 1205.) In the present case, while the section 366.26 report recommended adoption, and the juvenile court found the minor generally adoptable, the finding was not based solely on the willingness of the current caretakers to adopt (though the court properly found their willingness to adopt to be strong evidence of adoptability). A homestudy on those caretakers had been done, and they had passed. The minor has no relationship with either

6

biological parent. Finally, there is no evidence that his delays and emotional problems are permanent and intractable, rather than temporary and remediable.

In *Amelia S.*, the minor was one of 10 children, ranging in age from a newborn to nine, who were all taken into protective custody. (*Amelia S.*, *supra*, 229 Cal.App.3d at p. 1062.) Each permanency hearing dealt with five of the children. (*Ibid.*) The permanency reports indicated that the sibling set to which the minor belonged would all be placed together. (*Id.* at p. 1063.) The report stated that "[r]ecruitment for prospective adoptive families ha[d] been initiated and several possible families ha[d] already been identified," but did not state that any had expressed willingness to adopt. (*Ibid.*) A petition for modification filed by the adoption assessment agency asserted: "The minor is a special needs child in that the minor is part of a sibling set of ten. The minor suffers from social delays as well. Due to the above circumstances, [the agency] considers the minor a hard to place child." (*Ibid.*) The reviewing court found, under the circumstances, that the fact "a few foster parents were *considering* adoption" was "a far cry . . . from the clear and convincing evidence required to establish the *likelihood* of adoption." (*Id.* at p. 1065.) In the present case, unlike *Amelia S.*, there is no evidence that anyone has ever identified the minor as a "special needs child" or a "hard to place child." Furthermore, the fact that prospective adoptive parents are willing to adopt the minor distinguishes this case from *Amelia S.*, in which no such evidence existed.

Substantial evidence supported the juvenile court's finding of adoptability.

**DISPOSITION**

The order terminating father's parental rights is affirmed.

                                                         _____BUTZ_____, Acting P. J.

We concur:

_____MAURO_____, J.

_____HOCH_____, J.