Filed 1/21/15  In re C.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.S., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E061362 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J244783 & J244784) |
| v. | OPINION |
| C.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lily L. Sinfield, Judge.  Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

1

C.S. (Mother) appeals from an order terminating her parental rights as to her sons, six-year-old E.S. and three-year-old C.S. On appeal, Mother contends the juvenile court erred in finding the boys were adoptable and failing to find the "beneficial parental relationship" exception to termination applied. We reject these contentions and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

At the time of this dependency matter, Mother and her husband S.S. (Father) lived in San Diego County, where Father was employed in the Navy, with their sons and Mother's daughter, J.M., from a previous relationship.[1] The family came to the attention of San Diego County child protective services after a referral was received on April 19, 2012, alleging domestic violence between Mother and Father. The parents were observed arguing in their bedroom, pushing each other, and throwing objects at each other while the children were in the home. Father had sustained two black eyes and multiple lacerations to his face, head, and neck. Father had refused to obtain a restraining order and the military would not place a military protective order for Father.

A social worker had asked the parents to create a safety plan, but neither would consent to living apart. Father had intended to divorce Mother, but he would not permanently leave the home until the divorce was final. Mother had stated that she

[1] Father is not a party to this appeal.

2

would work on the issues with Father and was adamant that she and Father would stay together as a family.

A Navy Command Master Chief had informed the social worker that Father had shown up to work numerous times with scratches and bruises to his face. The military had referred the family to counseling services in November 2011 and again in February 2012, but Father had denied domestic violence in the home. In December 2011, the parents had attended a Christmas party for the sailors; and, at that time, Mother had punched the Naval ombudsman with a closed fist and told him to " 'stay out of their business.' " Father had admitted the recent incident of domestic violence to his Navy commander, stating that Mother had bitten him and broke his cellular phone and glasses during the altercation.

On April 20, 2012, Mother was arrested for violating a court order. Specifically, Mother had taken J.M. to the maternal grandmother's home instead of J.M.'s biological father's home. Father had bailed Mother out of jail, but Mother was arrested again on April 21, 2012, for another incident of domestic violence against Father. Father had again bailed Mother out of jail.

In addition to the recent arrests, Mother had been arrested five prior times for inflicting corporal injury on a spouse and battery on a spouse between 2004 and 2012, including an arrest in February 2012. Mother also had a history with child protective services dating back to 2006 where allegations of emotional abuse were substantiated. The boys were removed from parental care and placed in a children's center.

J.M.'s father informed the social worker that he had sought the assistance of the family court to protect his daughter from further exposure to domestic violence between Mother and Father. However, he was unable to obtain full custody. The social worker also removed J.M. from Mother and Father's care and recommended placing her in her father's care.

On April 24, 2012, petitions pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect), were filed on behalf of the boys.

At the April 25, 2012 detention hearing, the children were formally detained and a jurisdictional/dispositional hearing was set for May 16, 2012. The parents were provided with services and visitation.

Mother denied physically hitting Father and believed the children were too young to be traumatized by the fighting between her and Father. J.M., however, reported that the fighting scared the boys and that they cried when the parents fought. J.M. indicated that when Mother and Father fought, she would take the boys in her room to protect them. Both boys had tubes in their ears due to chronic ear infections, and E.S. had a speech delay. The boys were doing well in their caregiver's home. The caregiver reported that while Father was appropriate and loving during his telephone calls with the boys, Mother was inappropriate. Mother would call the caregiver numerous times to speak with the caregiver about the caregiver's license and address but would not ask to speak with the boys.

4

On May 9, 2012, the maternal grandmother's home was approved and the boys were placed with their maternal grandmother. The social worker recommended that J.M.'s biological father be given full custody of J.M. and that jurisdiction as to J.M. be terminated. Mother and Father, however, wanted all of the children back in their home; and had insisted the children were safe in their home and that they had never argued or fought in front of the children.

At the May 16, 2012 jurisdictional/dispositional hearing, the juvenile court sustained the dependency petitions and declared the boys dependents of the court.[2] Disposition of the matter was continued at the parties' request because there was a possibility the case would be transferred to Riverside County.

At the June 5, 2012 continued disposition hearing, the parents were ordered to participate in reunification services. At that time, the parents had informed the court that they had moved to an apartment in Rancho Cucamonga, and the court transferred the matter to San Bernardino County.

The San Bernardino County Juvenile Court accepted the transfer on July 10, 2012, and a six-month review hearing was set for December 5, 2012.

In a report dated August 24, 2012, the San Bernardino County Children and Family Services (CFS) noted that Mother's prior therapist terminated sessions after one visit due to Mother's lack of attendance. CFS subsequently referred Mother to

---

[2] Dependency as to J.M. was terminated with her biological father having full custody of J.M.

5

counseling services with an emphasis on domestic violence. The boys remained placed with the maternal grandmother and were in good health. The maternal grandmother had been supervising separate visits between the boys and their parents. However, after it became difficult for the maternal grandmother to supervise Mother's visits due to Mother being demanding and argumentative with her, CFS began supervising the visits. During this reporting period, both parents had cancelled some of their visits. The social worker reported that because the parents' level of commitment in engaging in services could not be determined at that time, the social worker recommended continuing reunification services for the parents.

At the August 24, 2012 review hearing, Mother's counsel informed the court that Mother was in therapy and would be starting parenting classes.

By the six-month review hearing, the parents had begun to come to terms with CFS's involvement and were more committed in completing their case plan. Mother appeared to have an understanding of her role in the children's removal from her care and was no longer confrontational with the social worker and the maternal grandmother. Mother had also been compliant with visitation and CFS's requirements. As such, the social worker recommended that services be continued for the parents and that the parents be provided with visitations together as a family.

The social worker also reported that the boys were in good health and that there were no health problems reported or major behavioral concerns. The boys were bonded with the maternal grandmother and had adjusted well in her home. The maternal

grandmother was committed to meeting the boys' social, emotional, educational, and medical needs and providing a permanent home for the boys.

At the December 5, 2012 six-month review hearing, the juvenile court continued the parents' reunification services and authorized CFS to liberalize visitation as to frequency and duration.

By February 4, 2013, the parents had continued to make progress in their case plan. Mother had completed three sessions of co-parenting and was referred to couple's therapy. Mother's therapist noted that Mother was making progress, but she had missed several sessions and had not called to reschedule. In addition, the social worker was concerned about allowing the parents unsupervised visits with the boys. Both parents' therapists had reported that it was not in the children's best interest for the parents to have unsupervised visits at that time. In addition, on January 18, 2013, CFS had received a referral alleging that Mother had come to a supervised visit with J.M. intoxicated and got into an argument with J.M.'s father in front of J.M. Mother had pushed J.M.'s father in anger and then pushed Father for attempting to intervene. While investigating the referral, the social worker learned that Mother had come to a supervised visit with the boys intoxicated. Father's therapist reported that there was a concern regarding Mother's frequent alcohol consumption and recommended random drug testing for Mother. The social worker recommended the court modify Mother's case plan to include random drug testing and anger management classes for Mother.

At the February 4, 2013 review hearing, the court amended Mother's case plan to include random substance abuse and alcohol testing with completion of an outpatient substance abuse program if she failed to test or tested positive. The court also added couple's counseling and anger management classes to Mother's case plan.

By the 12-month review hearing, Mother had continued to make progress in individual therapy and her therapist recommended continuing her services. However, Mother had tested positive for cocaine and was referred to an outpatient drug treatment program. Additionally, the parents had continued to engage in domestic violence and had unresolved marital issues that placed barriers on their progress. On April 2, 2013, law enforcement went to the parents' home due to a domestic disturbance; and during a recent conjoint therapy session, the parents had engaged in a heated verbal argument. The parents' conjoint therapist had informed the social worker that the parents had continued to fight verbally and that the fighting was to such a degree that the therapist warned the parents she would terminate therapy if they did not improve their interaction with each other. Furthermore, the parents' current lease on their apartment was not being renewed due to complaints from the neighbors that the parents constantly fought and argued.

The parents continued to have supervised visitation with either CFS or the maternal grandmother supervising the visits. The social worker noted that the parents were often engaged in conversation together with the boys feeling left out. The boys would often come to the social worker for affirmation and required prompting by the social worker or the parents to return back to where the parents were sitting.

The boys continued to reside with their maternal grandmother and were bonded with her. The boys were receiving Screening, Assessment, Referral and Treatment (SART) services. C.S had weekly play therapy sessions to eliminate aggression and self-injurious behavior and to reduce his tantrums. E.S. had been assessed with requiring play therapy to decrease his anxiety and depression and to manage sad feelings.

On May 3, 2013, the parents' conjoint therapist informed the social worker that the parents had made little progress in conjoint counseling and that the parents had continued to be verbally violent with each other and had little awareness of how their behavior had affected their children. The therapist had recommended further sessions for the parents to work on improving their communication skills and conflict resolutions.

At the May 16, 2013 12-month review hearing, the court continued reunification services as to both parents and set the 18-month review hearing for October 24, 2013.

By the 18-month review hearing, the social worker recommended terminating services for both parents and setting a section 366.26 hearing. The parents had continued to have domestic violence issues. On May 7, 2013, law enforcement had been called to the parents' home due to a domestic disturbance, resulting in their arrest for inflicting corporal injury on a spouse. An argument between the parents had turned physical and the parents had been seen punching and kicking each other multiple times. And, on July 7, 2013, an incident of alleged domestic violence had occurred between the parents and their roommate in which law enforcement had been called. Additionally, on September 29, 2013, Mother was arrested for disorderly conduct after she was found by

9

law enforcement in her car in a parking lot extremely intoxicated and hostile toward Father.

Further, Mother had been verbally abusive toward the maternal grandmother during a visit with the boys. In front of the boys, Mother had used profanity towards the maternal grandmother, calling her a " 'bitch' " and stating she would not get her " 'f[uc]king kids.' " The maternal grandmother had become " 'scared' " and " 'intimidated' " and gathered the boys and walked to her car. Additionally, the parents' conjoint therapist had not recommended reunification for the parents due to their highly volatile relationship. Mother's individual therapist reported that she did not believe Mother could provide a stable home environment for the boys as she had not taken responsibility for her actions and had not acknowledged the impact her domestic violence had on the children. The social worker therefore opined that the parents had not benefitted from services.

The boys had continued to receive SART services for behavioral issues. E.S. had been observed acting out after witnessing Mother's behavior toward the maternal grandmother. He had received a warning by his teacher for screaming during class while his teacher was talking; and he had taken off his seat belt while the bus was moving and had stood up and refused to heed to the bus driver's direction to sit down. The maternal grandmother reported that this was the first time E.S. had acted out at school and on the bus. The boys, however, had no major health problems and were developmentally on target.

On January 3, 2014, the parents' conjoint therapist reported that the parents' attendance had been inconsistent and that the parents had not made progress since the last reporting period. The therapist had attributed the parents' lack of progress to their unwillingness to deal with their marital issues and recent arrests. The therapist had recommended not continuing the parents' individual or conjoint therapy sessions as she did not believe the boys would be safe in their care. Mother's individual therapist also reported that Mother had not attended her counseling sessions since October 2, 2013.

At the January 6, 2014 contested 18-month review hearing, the juvenile court terminated the parents' reunification services and set a section 366.26 hearing.

In a section 366.26 report dated May 6, 2014, the social worker recommended terminating parental rights and finding the boys adoptable. C.S. was described as a "very cute, active and friendly" boy; and E.S. was described as a "sweet and adorable" boy. E.S. was in kindergarten and had been academically improving in the past trimester. C.S. had several visits to the doctors for his ears within the past year due to ear infections and a blood clot in his ear. C.S. had been treated with steroids and antibiotics and the doctors were confident with his treatment the blood in his ears would be cleared up. C.S. had done excellent on his hearing test, and the boys were meeting their developmental milestones. They had continued to be delayed in their speech but had progressed significantly. The maternal grandmother and C.S.'s speech therapist had reported that C.S. was very bright. In regard to their emotional development, the boys were described as having difficult behaviors, but the maternal grandmother noted that their behaviors had

improved and the frequency and duration of the tantrums had decreased.  The boys had been participating in group therapy to address their behavioral issues and the maternal grandmother had been attending parenting classes to help her manage and understand their behaviors.  E.S. had also been participating in individual therapy.  The maternal grandmother had reported that the boys' behaviors would regress immediately before and after visits with the parents.

Moreover, the boys had a strong attachment to the maternal grandmother and the maternal grandmother played a parental role in the boys' lives.  They sought out hugs and kisses from the maternal grandmother and had appeared comfortable in her home.  They had called the maternal grandmother " 'ma, mama, and mom.' "  And, when E.S. had been picked up from school by the maternal grandmother, he had run to her, yelling " 'Mom, I love you.' "  Additionally, when E.S., who had been described as a highly anxious child, had cried every morning and every night, the maternal grandmother had given him pep talks.  While the boys had made progress, they were still working on regulating their emotions, reducing physical and verbal aggression, improving compliance with adults, and improving frustration tolerance.  E.S. had also been trying to cope with the separation from his birth parents.  The maternal grandmother also had a strong attachment to the boys, and informed the social worker that they " 'have a wonderful relationship, funny, carrying [*sic*] and loving.  I love them to pieces.' "  The maternal grandmother had been committed to providing the boys with a stable, loving home.

Meanwhile, Mother had visited the boys weekly with no concerns noted with the exception of having missed approximately three visits. Father had also been visiting the boys but had recently relocated to Boston to live with his parents and did not plan on moving back to California.

The contested section 366.26 hearing was held on June 10, 2014. At that time, Mother testified that her visits had not been liberalized and had remained supervised two times per week and that when services were terminated, visits were reduced to once a week for two hours. She claimed that the boys were excited to see her and that they would give her a hug and kiss when they saw her. She also stated that she had purchased food for the boys; provided them with arcade money; changed their clothes; took them to the restroom; and addressed any misbehaviors and needs of the boys. She further asserted that the boys were "always kind of upset," seemed "sad," would sometimes cry at the end of the visits, and ask for her to come see them at the maternal grandmother's home. Mother did not believe it was in the boys' "best interests" to terminate her parental rights so that she could have an ongoing relationship with them and that a plan of guardianship was a better plan. Mother admitted missing two or three visits and not attending any of the boys' medical appointments.

Following arguments from counsel, the juvenile court found that the parental beneficial relationship exception to termination of parental rights did not apply. The court concluded the boys were adoptable and terminated parental rights. This appeal followed.

13

## II

## DISCUSSION

A.   *Adoptability Finding*

Mother contends the juvenile court erred when it found the boys were adoptable. Specifically, she argues the evidence was insufficient to support the court's finding by clear and convincing evidence the boys were adoptable, because they both suffered from speech problems, chronic ear infections, and had behavioral problems.

Whether a child is likely to be adopted is the "pivotal question" at the section 366.26 hearing.  (*In re Tamneisha S.* (1997) 58 Cal.App.4th 798, 804.)  Parental rights may be terminated only after a finding by clear and convincing evidence that a child will be adopted within a reasonable amount of time.  (§ 366.26, subd. (c)(1); *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1204.)

To determine whether a child is likely to be adopted the court focuses on whether the child's age, physical condition, and emotional state will create difficulty in locating a family willing to adopt the child.  (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)  It is not necessary that the child is already in a potential adoptive home or that proposed adoptive parents are " 'waiting in the wings.' "  (*Ibid*.)  What is required is clear and convincing evidence that adoption is likely to be realized within a reasonable time.  (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223.)

However, the fact that prospective adoptive parents express a willingness to adopt a child is evidence the child's age, physical and mental state, and other characteristics are

14

not likely to dissuade others from adopting if the anticipated placement fails. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650.) In other words, adoptability turns on the likelihood that someone will want to adopt the child soon, not on the likelihood that a particular family hopes or intends to do so. (*Ibid.*) "[I]n some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Id.* at p. 1650.) If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. (*In re Scott M.* (1993) 13 Cal.App.4th 839, 843-844.) When the child is deemed adoptable based solely on a particular family's willingness to adopt the child, the juvenile court must determine whether there is any legal impediment to that adoption. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.)[3]

On review, we determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child is likely to be adopted within a reasonable time. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562; see *In re Zeth S.* (2003) 31 Cal.4th 396, 406.) In making this determination, we

---

[3] The existence of a legal impediment to adoption is relevant if it "would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted. [Citation.]" (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) In the present case, while it appears that the court's adoptability finding was based at least in part on the existence of prospective adoptive parents who were willing to adopt and had already committed to the adoption, we are unaware of any legal impediment to that adoption.

resolve all conflicts in favor of the prevailing party.  Issues of fact and credibility are questions for the trier of fact, and we do not reweigh the evidence when assessing its sufficiency.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Here, substantial evidence supports the juvenile court's finding that the boys were likely to be adopted within a reasonable time.  Both the boys had received regular medical care, had no major health problems, and were found to be developmentally on target.  At the time of the section 366.26 hearing, C.S. was three years old, and E.S. was five years old.  C.S. was described as a "very cute, active and friendly" boy; and E.S. as a "sweet and adorable" boy.  E.S. was in kindergarten and had been academically improving.  C.S. had several visits to the doctors for his ear infections and a blood clot in his ear and had been treated with steroids and antibiotics.  His doctors were confident that the blood in his ears would be cleared up with his treatment.  Indeed, C.S. had done excellent on his hearing test.  The boys had continued to be delayed in their speech but had progressed significantly.  Although C.S. had difficulties in articulation, the maternal grandmother and C.S.'s speech therapist reported that C.S. was very bright.  In addition, although the boys were described as having difficult behavioral problems, the maternal grandmother noted that their behaviors had improved and the frequency and duration of the tantrums had decreased.  The boys had been participating in group therapy to address their behavioral issues and E.S. had been participating in individual therapy.

Moreover, the boys had a strong, loving attachment to the maternal grandmother and the maternal grandmother played a parental role in the boys' lives.  The boys sought

out hugs and kisses from the maternal grandmother, looked to her for comfort, and called her " 'ma, mama, and mom.' " The maternal grandmother also had a strong, loving attachment to the boys. And, despite the boys' medical and emotional issues which were slowly improving, the maternal grandmother still desired to adopt the boys and was committed to providing them with a stable, loving home. The record shows that with stability, consistency, and nurturing the boys' issues were improving and they were doing well in the maternal grandmother's home where they had resided most of their young lives.

Mother contends that there is insubstantial evidence to support the finding that the boys were adoptable due to ear problems, speech delays, daily tantrums, aggressive behavior, and anxiety issues. Mother maintains that although the maternal grandmother had expressed a willingness to adopt the boys, there were no families "willing to adopt these boys with their medical and behavioral characteristic."

Mother's position is flawed. First, the maternal grandmother was willing and ready to adopt the boys. Second, another family did not need to be identified as there was a relative willing to adopt the boys, and anytime a child is removed from parental care, preferential consideration is given to a request by a relative. (§ 361.3, subds. (a), (d) [Section 361.3, often referred to as the relative placement preference, provides that preferential consideration must be given to suitable relatives whenever the placement of a dependent child must be made.].) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated."

17

(§ 361.3, subd. (c)(1); *In re Sarah S.* (1996) 43 Cal.App.4th 274, 286 [preferential consideration places the relative at the head of the line when the court is determining which placement is in the child's best interest].)

Lastly, a mere possibility that a child may have future problems does not mean the child is not likely to be adopted. (*In re Jennilee T.*, *supra*, 3 Cal.App.4th at p. 225.) Even where the child has problematic characteristics because of the child's age or the presence of a diagnosed medical, physical, or mental handicap, he or she is likely to be adopted and the court may not delay permanency if there is an identified prospective family willing to adopt, as here. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650; § 366.26, subd. (c)(3).) A child with a disability, whether it be physical, mental, or emotional, is not necessarily unadoptable. (*In re Jennilee T.*, at pp. 224-225.) Thus, even if the boys had ear infections, tantrums, speech delays, and some behavioral and emotional issues, this would not necessarily mean they were unadoptable. Indeed, if we were to adhere to Mother's way of thinking, no child with possible chronic ear infections, tantrums, speech delays, aggression, and anxiety could be freed for adoption until sufficient time had elapsed within which a determination could be made with absolute certainty as to the child's physical, mental, and emotional health. Furthermore, the maternal grandmother was aware of the boys' medical, behavioral, and emotional issues, and had been very active in helping them make progress with their issues. In fact, the maternal grandmother took the boys to group and individual therapy and reported that the boys were making improvements and progress. Moreover, the maternal grandmother had

continually expressed her willingness to adopt the boys and provide them with a stable, loving home.

The record does not support Mother's contention that there is a legal impediment to adoption by the maternal grandmother. (*In re Carl R.*, *supra*, 128 Cal.App.4th at p. 1061.) The maternal grandmother had an approved home, and by the time of the section 366.26 hearing, she had cared for the boys for over two years and was familiar with their behaviors, their medical, emotional and educational needs, and the support services that they required. Notwithstanding the above, Mother relies on several cases to support her argument that the evidence is insufficient to support a finding of adoptability. She relies on *In re Jerome D.*, *supra*, 84 Cal.App.4th 1200 and *In re Asia L.* (2003) 107 Cal.App.4th 498. Mother's reliance on these cases is unavailing as those cases are distinguishable from the instant case.

In *In re Jerome D.*, *supra*, 84 Cal.App.4th 1200, the child's prospective adoptive parent was the mother's ex-boyfriend, who had "serious shortcomings as a caretaker" (i*d*. at p. 1208), was unwilling to adopt the child, and with whom the child "seemed lonely, sad, and the stepchild or 'the odd child out' " (*id*. at p. 1206). Additionally, the child was nearly nine years old at the time of termination of parental rights, had a strong attachment to his mother, and had stated his preference to live with his mother. (*Id*. at pp. 1206-1207.) In *In re Asia L.*, *supra*, 107 Cal.App.4th 498, there was no evidence of any approved families willing to adopt the children. (*Id*. at p. 512) The children had emotional and behavioral problems serious enough to make them difficult to place for

19

adoption (§ 366.26, subd. (c)(3)), and were not in an adoptive placement. At best, their foster parents were willing to "explore the option of adopti[on]." (*In re Asia L.*, *supra*, 107 Cal.App.4th at p. 512.) The court considered such evidence "too vague" to support an adoptability finding. (*Ibid.*)

In contrast, here the maternal grandmother was committed to adopting the boys and the boys were bonded and attached to their maternal grandmother. The existence of prospective adoptive parents, although not determinative, is nonetheless a factor in determining whether a child is adoptable. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400.)

Furthermore, although a child has a history of medical, behavioral, and emotional problems, when the social worker is aware of the child's medical, developmental or mental problem, but believes the problems do not impede the child's chances for adoption, the problems do not render the child unadoptable. (See *In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523-525, overruled on other grounds *In re Zeth S.*, *supra*, 31 Cal.4th 396, 413-414.) Here, the social worker believed the boys were adoptable despite their ear infections, speech delays, aggression, and anxiety issues, many of which had significantly improved. Moreover, the maternal grandmother had encountered the boys' medical, behavioral, and emotional issues, but was nevertheless willing to adopt them.

*In re Helen W.* (2007) 150 Cal.App.4th 71 is instructive. There, two young children "suffered from various physical and developmental conditions that required a series of evaluations and tests during their dependency." (*Id.* at p. 74.) One was

20

developmentally disabled and had serious neurological abnormalities; the other was mildly autistic, was "significantly below average in intellectual, speech and language, and adaptive functions," and exhibited violent behavior towards other children. (*Id*. at p. 75.) According to the agency, "even though the children have significant medical and developmental challenges, they each exhibited likeable qualities, and the foster mother was committed to adopting both of them." (*Id*. at p. 76.) Nonetheless, the mother argued on appeal that the court's adoptability finding was not supported by substantial evidence. Rejecting that argument, the appellate court explained: "Both children suffer from conditions that require time to determine the full severity of the issues they will face. But [the agency] methodically reported the children's medical, developmental, emotional, and behavioral conditions throughout the two years of their dependency. The adoption assessment included a synopsis of the children's conditions. And the foster mother—the prospective adoptive parent—accompanied the children to appointments, advocated for services, and was fully aware of their medical and psychological conditions. Nowhere in the statutes or case law is certainty of a child's future medical condition required before a court can find adoptability. [Citation.]" (*Id*. at p. 79.)

The *Helen W.* court also rejected the mother's contention that the juvenile court "impermissibly relied upon only the foster mother's intention to adopt in finding the children adoptable." (*In re Helen W.*, *supra*, 150 Cal.App.4th at p. 79, italics omitted.) In so doing, the reviewing court pointed to evidence in the record describing the children's appealing characteristics, including their young ages, their attractive physical

21

appearances, and their affectionate personality traits. (*Id*. at p. 80.) Moreover, citing *In re Sarah M.*, the court found that even if the juvenile court had relied solely on the willingness of the prospective adoptive parent to adopt, short of a legal impediment to adoption, the willingness of the adoptive parent constituted clear and convincing evidence of adoptability. (*In re Helen W.*, at p. 80.)

Based on the foregoing, we reject Mother's claim that the juvenile court erred in finding the boys were adoptable.

B.      *Beneficial Parent-Child Relationship Exception*

Mother also contends the juvenile court erred in finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(A), did not apply to preclude the termination of parental rights.

After reunification services are denied or terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) A hearing under section 366.26 is held to design and implement a permanent plan for the child. At a section 366.26 hearing, the court must terminate parental rights and order the child placed for adoption if it determines, under the clear and convincing standard, that it is likely the child will be adopted. (§ 366.26, subd. (c)(1).)

" 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53; see § 366.26, subd. (c)(1).) " 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and

permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.*, *supra*, at p. 53.)  A statutory exception to the general rule requiring the court to choose adoption exists where "[t]he court finds a *compelling reason* for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B), italics added) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (*Id.*, subd. (c)(1)(B)(i); see *In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  There is no dispute here that Mother had maintained regular visitation with the boys.

In deciding whether the parent-child beneficial relationship exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  "If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Ibid.*)  The parent-child relationship must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Ibid.*)

The parent-child relationship "exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of

visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*Id.* at p. 1350.) Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

"The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption." (*In re Casey D.*, *supra*, 70 Cal.App.4th 38, 51.) "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact." (*Ibid.*) "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Ibid.*) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350; see *In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

24

A parent claiming the applicability of the parent-child relationship exception has the burden of proof. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re C.B.* (2010) 190 Cal.App.4th 102, 133-134; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.) The parent must show both that a beneficial parental relationship exists *and* that severing that relationship would result in great harm to the child. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion: The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a "compelling reason" (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) A juvenile court's ruling on whether there is a "compelling reason" is reviewed for abuse of discretion because the court must "determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption." (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315, italics omitted.)

Mother argues that substantial evidence supports the conclusion that a beneficial parental relationship existed. However, since it is the parent who bears the burden of producing evidence of the existence of a beneficial parental relationship, it is not enough

25

that the evidence supported such a finding; the question on appeal is whether the evidence compels such a finding as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) As the court in *In re I.W.* discussed, the substantial evidence rule is "typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." (*Ibid.*) When, however, the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the [Mother's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding' [in Mother's favor]. [Citation.]" (*Ibid.*) Accordingly, unless the undisputed facts established the existence of a beneficial relationship as a matter of law, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Here, although we agree with Mother that the existence of a beneficial parental relationship does not depend on the child having a primary attachment to the parent or on the parent maintaining day-to-day contact with the child, there is no evidence to show the boys had a "substantial, positive emotional attachment" to Mother. (*In re Autumn H.*, *supra*, 27 Cal.App.4th 567, 575; see *In re S.B.* (2008) 164 Cal.App.4th 289, 299.) C.S. was around 18 months old and E.S. was almost four years old when they were removed from Mother's care in April 2012 and placed with the maternal grandmother. By the time of the section 366.26 hearing in June 2014, C.S. had resided with the maternal grandmother for over two years, most of his young life; and E.S. had spent almost half his life with the maternal grandmother. Although Mother had visited the boys, and during some of the visits Mother had utilized her time well, the evidence regarding Mother's visitation in no way showed that she occupied a parental role in the boys' lives. Further, in some of the visits, Mother had acted inappropriately with the maternal grandmother and during one visit with the boys, Mother was intoxicated. And, when the parents had visited together, the social worker noted that the parents had often engaged in conversation together and the boys felt left out. For these reasons, as noted by the therapists and the social worker, Mother had never progressed beyond weekly supervised visits.

Even if Mother had established the existence of a beneficial parental relationship, she cannot show the juvenile court abused its discretion in regard to the second component of the beneficial parental relationship exception. The ultimate question we

27

must decide is whether the juvenile court abused its discretion by failing to find that termination of parental rights would be so detrimental to the boys as to overcome the strong legislative preference for adoption. That decision is entrusted to the sound discretion of the juvenile court. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) We cannot find an abuse of discretion unless the juvenile court exceeded the bounds of reason. (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318-319.) " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*Id.* at p. 319.)

Here, Mother did not introduce any evidence showing the boys would be greatly harmed by the termination of her parental rights. The boys were strongly bonded to the maternal grandmother. They referred to the maternal grandmother as " 'ma, mama, and mom,' " and gave her hugs; and the maternal grandmother reciprocated their affections. They looked to the maternal grandmother for love, comfort, and security. There was no evidence to show that the boys were deeply upset or always cried following their visits with Mother. Rather, the record indicates that the boys, while enjoying some of their visits with Mother, were attached, happy, and well bonded to their maternal grandmother and that they were thriving in the maternal grandmother's home. There was no evidence whatsoever that the boys would suffer great detriment if parental rights were terminated. Consequently, the juvenile court could reasonably conclude that termination of Mother's parental rights would have no detrimental impact on the boys.

For the foregoing reasons, we conclude that the juvenile court did not err in refusing to apply the beneficial parental relationship exception.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ            <br>P. J.

We concur:

McKINSTER          <br>           J.

MILLER            <br>           J.