Filed 5/4/15  In re Jason W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JASON W. et al., Persons Coming Under the Juvenile Court Law. | D067040 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent. <br><br> v. <br><br> AMANDA G., <br><br> Defendant and Appellant. | (Super. Ct. No. SJ11987B, D, E) <br><br> ORDER MODIFYING OPINION <br><br> [NO CHANGE IN THE JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 30, 2015, be modified as follows:

On the first page, the name "JACOB W." in the title is changed to read "JASON W."

There is no change in the judgment.

NARES, Acting P. J.

Copies to:  All parties

Filed 4/30/15  In re Jacob W. CA4/1 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re JACOB W. et al., Persons Coming Under the Juvenile Court Law. | D067040 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent. | (Super. Ct. No. SJ11987B, D, E) |
| v. | |
| AMANDA G., | |
| Defendant and Appellant. | |


APPEAL from findings and orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed in part; reversed in part and remanded with directions.


Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jennifer Stone, Deputy County Counsel, for Plaintiff and Respondent.

Amanda G. challenges the termination of her parental rights to her children, A.R., Jonathan D. and Jason W. under Welfare and Institutions Code section 366.26.[1] She contends there is not substantial evidence to support the finding the children are likely to be adopted within a reasonable time if parental rights are terminated. She also maintains that the San Diego County Health and Human Services Agency (Agency) did not complete the assessment report required under section 366.22, subdivision (c)(1)(D), which requires a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent.

We conclude that the Agency was not required to complete a preliminary assessment under section 366.22, subdivision (c)(1)(D) because a prospective adoptive parent had not yet been identified for the children. We further conclude there is substantial evidence to support the finding that Jonathan and Jason are generally adoptable, and we affirm the judgment terminating parental rights to them. However, there is no substantial evidence to support the finding that A.R.is adoptable. We therefore reverse the judgment terminating parental rights to A.R.

FACTUAL AND PROCEDURAL BACKGROUND

Amanda G. is the mother of five children: daughters Z.D., A.R. and N.R., and sons Jonathan D. and Jason W. (collectively, the children). A.R., Jonathan and Jason are the subjects of this appeal.[2] Because the issues in this appeal concern the adequacy of the Agency's adoption assessment and whether there is substantial evidence to support a finding of

---

[1]    Unless otherwise specified, statutory references are to the Welfare and Institutions Code.

[2]    The children's fathers do not appeal the termination of their parental rights.

adoptability, our recitation of the procedural history of the children's dependency cases is brief.[3]

The children's mother, Amanda, has a history of mental illness and methamphetamine use. Her youngest son, Jason, was a dependent of the court in 2008 and 2009 due to his parents' methamphetamine use. At that time, Amanda's other children were in the care of their maternal grandmother. Jason's father, Gregory W., completed his case plan and the Agency returned Jason to his care in December 2009. At some point in time, not clear from the record, Gregory moved in with Amanda and her four other children.

The children's current dependency proceedings began in May 2012 when the Agency learned that Gregory had impregnated his 13-year-old stepdaughter. Gregory was arrested on charges of statutory rape, continuous sexual abuse of a child, aggravated sexual assault and related counts. Although the other children initially denied Gregory had sexually abused them, each child subsequently described sexual molestation. Gregory is serving a 20-year sentence in state prison.

The court ordered a plan of reunification services for Amanda. She continued to visit her children throughout their dependency proceedings. The court terminated Amanda's reunification services at the children's 18-month review hearings. In March 2014, Amanda told the social worker that she wanted A.R., Jonathan and Jason to have the most stable plan possible and was willing to accept adoption by their current caregivers. With the court's permission, the Agency began adoption recruitment activities on behalf of the children in May 2014.

---

[3] Background details of the children's cases are set forth in a nonpublished opinion, *In re Jonathan D.* (Jan. 15, 2013, D062352).

3

The section 366.26 hearing was held on November 10, 2014. The court admitted in evidence the reports of the Agency and the court-appointed special advocate. The social worker recommended the court terminate parental rights to allow A.R., Jonathan and Jason to be placed for adoption, preferably as a sibling group. No other evidence was presented.

*Jason*

In April 2008, when he was six months old, Jason was adjudicated a dependent of the juvenile court. While in foster care, Jason was diagnosed with genital warts. The cause of the warts was unclear at that time. Jason was four years old when he was removed from his parents' custody for the second time.

At the time of the section 366.26 hearing, Jason was seven years old. He was a very active child and struggled with socialization. At school, he hit other children, exposed his private parts to another student, and urinated on the bathroom floor and played with his urine. At home, Jason would masturbate up to 45 minutes at a time, causing bleeding. He played with his feces. He told his caregiver, "Daddy loves me[,] that's why he touches my private parts."

The Agency referred Jason for a psychiatric evaluation. His behavior stabilized in foster care but his affect was flat, distant and indifferent. He was impulsive and fixated on food. In June 2013, his caregiver reported that Jason had killed her pet parrot by repeatedly poking it with a pencil. Jason showed no remorse, saying the parrot was old and made too much noise.

Jason did not want to be alone with his mother. He was calmer when he did not visit her. His caregiver was unable to adopt him and his brother, Jonathan, because of her age and their behaviors. The social worker believed that Jason was generally adoptable. He had social

4

and behavioral problems but was generally healthy.  There were 21 families in San Diego County who were willing to adopt a child like Jason.  Jason was too young to understand the concept of adoption.

A month before the section 366.26 hearing, the court authorized a request to prescribe a psychotropic drug for Jason to treat his diagnosis of attention deficit hyperactivity disorder (ADHD).  His caregiver said Jason's behavior improved 90 percent.  Jason said, "[T]his is the happiest [I]'ve ever been."

*Jonathan*

Jonathan was an active, social nine year old, with no developmental concerns.  Because he lagged academically, he received several hours of specialized academic instruction a week and was now reading at grade level.  Jonathan was well-mannered and talkative.  After reunification services were terminated, he appeared "almost relieved" when told he would be adopted.  Jonathan was in a stable foster care placement with Jason.  Jason's sexualized behaviors aggravated Jonathan and at one point he expressed a desire to be in a separate home from his brother.  In January 2014, Jonathan was referred for a psychiatric assessment for ADHD.

Jonathan enjoyed spending time with his mother.  In April, he told the social worker he was "kind of sad" about the idea of adoption.  The social worker believed that Jonathan was generally adoptable.  He was healthy, handsome, sweet and talkative, and did not appear to have mental health concerns.  There were 18 families in San Diego County willing to adopt a child like Jonathan.  In July, Jonathan said he felt good about being adopted.  He said, " . . . maybe I can have a better life, better family, and better toys.  Toys are very important,

too." He wanted to go to a home where there were lots of Legos and a family that "takes good care of us."

In October, the court authorized a request to prescribe a psychotropic drug for Jonathan to treat ADHD. Like Jason, Jonathan's behavior improved approximately 90 percent.

*A.R.*

At the time of the section 366.26 hearing, A.R. was 12 years old. She was diagnosed with agenesis of the corpus callosum (ACC), a rare birth defect in which there is a complete or partial absence of the band of white matter connecting the two hemispheres of the brain. A.R. had mild cerebral palsy, mild intellectual disability and hyperthyroidism. She was on medications to reduce aggression and help her sleep, and required growth hormone therapy. She functioned at the level of a five or six year old. Her behaviors included tantrums, physical aggression, noncompliance and lying. Two foster placements had failed because of her behaviors. She had been in her current foster home since February 2013. Her caregiver locked herself and her children in a bedroom when A.R. had a tantrum. The caregiver was willing to care for A.R. until her 18th birthday but was not willing to adopt her. A.R.'s behavior improved under a structured behavioral services plan.

When the social worker first talked to A.R. about adoption, A.R. said she did not want to be adopted. After further discussions, A.R. said she would consent to adoption by her current caregiver with her sister N.R., but that person was not willing to adopt A.R. In May 2014, the social worker reported that A.R. was not generally adoptable and there was no one who was specifically willing to adopt her.

In July, the social worker said A.R. asked to be adopted with her brothers. A.R. said she would be sad if she could not talk to her mother. She preferred an adoptive home that

6

would allow her to have continued contact with her mother. The social worker identified one family in San Diego County willing to adopt a child like A.R.

*Additional Information*

In its addendum report of November 5, 2014, the social worker reported that a family had come forward and expressed interest in the children after seeing them on an Adopt 8 news segment. The family, a husband and wife, had completed an adoption orientation, fingerprinting, and a Trauma Informed Parenting Course. The wife was a child therapist who had worked in child protective services. The husband had retired to care for an ill parent but was planning to return to work. They had a good support system. The Agency had not released any confidential information about the children to this family and they had not yet met the children.

*Court's Ruling*

The court said it preferred to have Jason, Jonathan and A.R. adopted together but it realized that their opportunity for adoption as a sibling set was limited because of each child's unique needs. The court was "very hopeful" about the family that had come forward after seeing the children on an adoption recruitment program.

Assessing each child individually, the court found that Jason was a young child who had an extraordinary need for attention. However, he was doing well with consistent parenting in a stable home, his behavior had recently stabilized with medication and he would greatly benefit from adoption.

The court found that Jonathan was generally adoptable. He was a sensitive, loving and sweet child who was able to bond with his caregiver. Jonathan's behavior had significantly

7

improved with medication and he was doing better in school. Jonathan expressed a desire to be adopted and clearly wanted to have a permanent home.

With respect to A.R., the court said she had some unique needs and mental and physical challenges. The court found that adoption was in her best interests. The court found that there were no exceptions to termination of parental rights, and declared Jason, Jonathan and A.R. free from parental custody and control.

## DISCUSSION

## I

## ASSESSMENT REPORT

## A

### *Legal Framework and Standard of Review*

When a dependency case is referred for a selection and implementation hearing, the court is required to direct the Agency to prepare an assessment as part of its report to the court. (§§ 361.5, subd. (g)(1), 366.21, subd. (i)(1), 366.22, subd. (c)(1), 366.3, subd. (g).) "To fulfill the legislative mandate 'to provide stable, permanent homes for these children,' the court is required to consider the assessment report . . . and receive other evidence that the parties may present." (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 12 (*Valerie W.*).)

The assessment report must contain an evaluation of the child's medical, developmental, scholastic, mental, and emotional status, an analysis of the likelihood that the child will be adopted if parental rights are terminated, and a statement from the child concerning placement and adoption, if appropriate. (§ 366.22, subd. (c)(1)(C), (E), (F); *In re Crystal J.* (1993) 12 Cal.App.4th at 407, 411.) In addition, the social worker must provide "[a] preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or

8

legal guardian, particularly the caretaker, to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship."  (§ 366.22, subd. (c)(1)(D).)

"The assessment report is 'a cornerstone of the evidentiary structure' upon which the court, the parents and the child are entitled to rely."  (*Valerie W*., *supra*, 162 Cal.App.4th at p. 11.)  Deficiencies in an assessment report go to the weight of the evidence, and if sufficiently egregious may undermine the court's decision to terminate parental rights.  (*Id.* at p. 14.)

## B

### *Analysis*

Amanda argues the court erred when it determined the children were likely to be adopted because the Agency did not provide any of the statutorily required information about the family that had expressed an interest in adopting the children.  Amanda misconstrues the statute.

Section 366.22, subdivision (c)(1)(D) requires a preliminary assessment of the eligibility and commitment of any *identified* prospective adoptive parent.  It does not require an assessment of persons who have expressed an interest in a child but have not yet indicated they are willing to proceed with adoption.  The Agency points out that at no time did it represent to the court that the children were specifically adoptable.  The record shows that the Agency did not identify the interested family as the children's prospective adoptive parents.  A person is not a prospective adoptive parent merely because he or she is interested in adoption and wants to learn more about a particular child or sibling set.  (See § 366.26, subd. (n)(1)

9

[court may designate a child's current caregiver as a prospective adoptive parent if the child has lived with the caregiver for at least six months, the caregiver currently expresses a commitment to adopt the child and has taken at least one step to facilitate the adoption process].) Thus, the Agency was not required to provide a preliminary assessment of the interested family to the court, and its assessment report was not deficient.

## II

## ADOPTABILITY

## A

### *Legal Framework and Standard of Review*

A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 (*Zeth S.*).) The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231-1232 (B.D.).) Where appropriate, the juvenile court should also consider the child's feelings toward his or her parents, foster parents and the prospect of adoption. (*Ibid*.)

On review, we determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child is likely to be adopted within a reasonable time. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562.) The evidence must be sufficiently strong to command the unhesitating assent of every reasonable mind. (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205-1206.) We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment of the trial court. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

*Analysis*

Amanda contends the juvenile court erred with it terminated parental rights because there was not clear and convincing evidence the children were likely to be adopted. She argues Jason, Jonathan and A.R. each have severe mental and behavioral problems and are not generally adoptable.

The Agency argues that each child was generally adoptable at the time of the section 366.26 hearing because multiple families had expressed an interest in adopting them and the Agency had expedited a home study for one of the families. The Agency argues Amanda overstates the children's behavioral problems because the record shows that each child's behavior had greatly improved with medication and therapy.

There is substantial evidence in the record to show that Jason and Jonathan are generally adoptable. Although they had suffered the effects of sexual abuse and other trauma, they had been in the same foster home since May 2012, which permits the reasonable inference that their behaviors, while challenging, were not so severe as to jeopardize their placement. The social worker believed that Jonathan and Jason were generally adoptable. Jonathan was healthy, handsome, sweet and talkative, and did not appear to have mental health concerns. Jason was a cute, healthy boy who had social and behavioral problems. When Jason's and Jonathan's diagnosis of ADHD was treated with medication, their behaviors improved 90 percent. Jason said he was the happiest he had ever been in his life. The social worker reported that in San Diego County alone, there were 21 families that were interested in adopting a child like Jason and 18 that were interested in adopting a child like Jonathan. A family had come forward that was interested in adopting them. We conclude there is

substantial evidence to support the finding that Jason and Jonathan are likely to be adopted within a reasonable time if parental rights are terminated. (*Zeth S.*, *supra*, 31 Cal.4th at p. 406.)

In contrast to her brothers, A.R.'s circumstances were more complex. She had a rare genetic disorder, mild cerebral palsy, mild intellectual disability and hyperthyroidism. She was on medications to reduce aggression and help her sleep, and required growth hormone therapy. She functioned at the level of a five or six year old. Her behaviors included tantrums, physical aggression, noncompliance and lying. Two foster placements had failed because of her behaviors. In her current foster home, her behaviors were so extreme that her caregiver locked herself and her children in a bedroom when A.R. had a tantrum. In May 2014, the social worker reported that A.R. was not generally adoptable and there was no one who was specifically willing to adopt her.

At the time of the section 366.26 hearing, A.R. was 12 years old. (See § 366.26, subd. (c)(1)(B)(ii) [a child 12 years of age or older may object to adoption].)[4] A.R. initially objected to being adopted. She said she would be sad if she could not talk to her mother. Later, A.R. said she would consent to adoption if she could be adopted with her brothers and that she would like to maintain contact with her mother. Although the social worker identified one family in San Diego County willing to adopt a child like A.R., and another family had expressed an interest in adopting all three children, there is no evidence that those families could meet A.R.'s specific needs. The court reasonably said it was "very hopeful" about the family that had come forward, but that is not a sufficient basis on which to find that a child is

---

[4] We do not address whether section 366.26, subdivision (c)(1)(B)(ii) applies to a child who is 12 years of age or older but functions on the level of a much younger child.

adoptable. A.R.'s age, physical condition and emotional health, and her feelings about her mother and the prospect of adoption, present some difficulties in finding a person willing to adopt her. (*B.D.*, *supra*, 159 Cal.App.4th at pp. 1231-1232.) At the time of the section 366.26 hearing, A.R. did not have a prospective adoptive parent who was specifically interested in adopting her. On this record, we are unable to conclude there is substantial evidence in the record to support the finding that A.R. is likely to be adopted within a reasonable time if parental rights are terminated. (*Zeth S.*, *supra*, 31 Cal.4th at p. 406.)

## DISPOSITION

With respect to Jason and Jonathan, the findings of adoptability are affirmed, and the orders terminating parental rights are also affirmed. With respect to A.R., the adoptability finding is reversed, and the order terminating parental rights is therefore reversed without prejudice. A.R.'s case is remanded to the juvenile court with directions to hold another hearing under section 366.26 to select and implement a permanent plan for her.


NARES, Acting P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.

13