Filed 7/8/16  In re K.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.T., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065082 |
| Plaintiff and Respondent, | (Super.Ct.No. J251773) |
| v. | OPINION |
| T.T. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, T.T.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant, M.T.

1

Jean-Rene Basle, County Counsel, Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

Appellants T.T. (mother) and M.T. (father) have filed separate briefs regarding their daughter, K.T. (the child). Mother claims that the beneficial parental relationship exception applied. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] Father joins her argument. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On October 23, 2013, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was 16 months old at the time. The petition alleged that the child came within the provisions of section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). The petition alleged that father and mother (the parents) left the child in the care of relatives without providing adequate provisions for care or support of the child. It also alleged that the parents lacked a safe and suitable home and diapers, clothing, or a crib for the child. The petition further included the allegations that mother had a history of substance abuse, and that she had previously failed to complete a case plan and had an open, permanent placement case with regard to severe neglect of the child's sibling.

In the detention report, the social worker reported that the parents left the child with an "unfit cousin" without providing any food, clothing, money, or diapers. The

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

parents were evicted from their apartment and moved to a trailer where there was no running water or carpet. Mother later contacted the paternal grandmother and asked her to go get the child. The paternal grandmother picked up the child, but was unable to care for her, so she gave the child to a paternal uncle and his wife. The social worker interviewed the paternal uncle, who had agreed to care for the child. He said the parents rarely called and had not seen or provided anything for the child. The social worker also interviewed mother, who denied abandoning the child. When asked if she made an arrangement with the cousin for the child to stay, mother avoided the question and said she and father were going to get a place and then get the child back. The social worker talked to the paternal uncle's wife to see if they were still willing to keep the child; however, she said that mother threatened her about something, so they were no longer willing to care for the child. The social worker determined that the child would need to be detained, since she did not have a suitable place to go.

On October 24, 2013, a juvenile court detained the child in confidential foster care. The court ordered visitation for mother and father to be a minimum of two times a week.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on November 8, 2013, stating that some of the allegations in the petition were not supported by the evidence, but others were. The social worker recommended that reunification services be provided to the parents.

3

The social worker reported that when she interviewed mother, mother denied any history of substance abuse or mental health issues. However, past CFS records indicated that she had previously been diagnosed with severe anxiety and bipolar disorder.

The social worker further reported that some of the concerns surrounding the child's removal had been resolved. The parents secured an appropriate residence for the child and obtained provisions, such as a crib, clothing, and diapers. However, the social worker was still concerned that both parents lacked appropriate decision making skills when it came to the welfare and safety of the child. The social worker recommended that the child remain in foster care until they started their services and mother's mental health status was evaluated.

As to visitation, the social worker reported that the parents were having supervised visits. The social worker supervised one visit at the CFS office and stated that the parents were happy to see the child; however, the child did not bond well with them during the visit and cried most of the time. Although both parents tried to console her, she was observed to be uncomfortable around them. There was an "obvious lack of attachment between the child and the parents," which the social worker speculated could have been due to the child not having seen them for over one month.

The social worker was overall concerned with the parents' ability to make appropriate decisions for the child. The parents admitted the child was out of their care for about three weeks and that neither of them felt the need to visit her during that time. They admitted that they did not provide the child with any necessities during the time she

4

was out of their care and that they had made no plan as to how long she would remain with relatives. Neither parent felt that their actions were neglectful or that there was cause for concern.

The social worker reported that the child was transitioning well in her foster home. She was happy and did not appear to display any negative effects from the recent placement.

Before the jurisdiction/disposition hearing took place, the social worker filed an amended section 300 petition, which included allegations of mother's mental health issues and history of domestic violence.

The court held a contested jurisdiction/disposition hearing on December 4, 2013. It found that the child came within the provisions of section 300, subdivisions (b) and (j), declared her a dependent of the court, removed her from the parents' custody, and maintained her in foster care. The court ordered the parents to participate in reunification services.

*Six-month Status Review*

The social worker filed a six-month status review report on May 28, 2014, and recommended that reunification services be continued. The parents were participating in services, and the prognosis for reunification was good. The parents were visiting the child twice a week, but during February and March, the visits became irregular. In the latter part of March, they began visiting the child consistently, once a week. The social

worker reported that the child was more receptive to the parents than when visits first began. The parents were affectionate and appropriate with her.

The court held a six-month review hearing on June 4, 2014, and continued reunification services.

*12-month Status Review*

The social worker filed a 12-month status review report on November 12, 2014, and recommended that the court return the child to the parents' home but continue the dependency under a plan of family maintenance. The parents had completed parenting classes and were participating in counseling. They were also having unsupervised visitation, including weekends and overnight. The parents had started having unsupervised visits in August, and the child did not have any apprehensions. Overnight visits began in October, and, although the child initially struggled, she was doing better and would return to the foster home happy. CFS involvement was still necessary to ensure the family was stabilized and the parents were meeting the child's needs.

At the 12-month review hearing on November 19, 2014, the court returned the child to the parents' custody under a plan of family maintenance.

*Section 387 Petition*

The social worker filed a section 387 supplemental petition on March 19, 2015, alleging that, on March 13, 2015, mother called CFS and said she could no longer care for the child because of her fibromyalgia, lack of provisions for the child, and ongoing discord with father. The social worker reported that mother called in and reported that

she and father had been fighting a lot in front of the child, who was now two years old. Father would also get frustrated and yell at the child. Mother wanted a social worker to take the child because of the ongoing arguments, and she was open to having the child adopted.

However, on March 17, 2015, when the social worker contacted mother, she said she felt she was too hasty in calling before and now did not want to lose custody of the child. Mother said they could barely afford to feed the child due to financial issues; however, her father agreed to help them with the child.

The social worker consulted with her supervisor about the situation. About 15 minutes later, mother contacted the supervisor and said she was having an anxiety attack. She then said she felt it would be better if the child was in foster care, because it was difficult for her to care for the child. Father agreed. On March 17, 2015, the parents brought the child to the CFS office, and the child was taken into custody and placed back in foster care with the same family. Both parents signed declarations stating that they were not ready to have the child in their home, that they needed more time, and that they were voluntarily relinquishing her to CFS.

At a detention hearing on March 20, 2015, the court detained the child and placed her back in the same foster family's home. The court ordered supervised visitation twice a week.

*Jurisdiction/Disposition*

The social worker filed another jurisdiction/disposition report on April 8, 2015, recommending that no reunification services be offered to the parents and that a section 366.26 hearing be set to determine the most appropriate permanent plan.

The court held a hearing on April 10, 2015, at which time both parents signed a waiver of rights form, submitting on the petition. They also informed the court that they were not able to care for the child and that it was their wish for the child to be adopted. The court set a section 366.26 hearing to select a permanent plan.

*Section 366.26*

The social worker filed a section 366.26 report on July 31, 2015, recommending that parental rights be terminated and the permanent plan of adoption be implemented. The social worker reported that the child had been in the same foster care home since the initial removal, with the exception of approximately four months when she was returned to the parents' home. The prospective adoptive parents now wanted to adopt the child. They said the child called them "daddy" and "mom" and told people they were her parents. The prospective adoptive parents were attached to the child and could not imagine their family without her. The social worker stated that the child appeared securely bonded with them. They had two of their own sons and lived in a spacious, five-bedroom home in a quiet neighborhood. The prospective adoptive mother worked as a nurse for 20 years, but now stayed home to care for her children. The prospective

adoptive father worked as a teacher. The prospective adoptive parents were dedicated to the child and committed to raising her to adulthood.

The social worker further reported that the parents had been having visits with the child once a month and that they were going well.

The court held a section 366.26 hearing, and mother's counsel objected to the termination of parental rights, arguing that the beneficial parental relationship exception applied. She argued that a plan of legal guardianship should be selected. Mother testified at the hearing and said she was visiting the child two times a month, for two hours each time. She said the child was very happy to see her when she arrived, hugged her and cried when she left. Mother said she called her "mom." At visits, they talked or saw movies, and she brought toys, clothes, shoes, and food. At the end of visits, the child would tell her she wanted mother to go with her. After hearing mother's testimony and closing arguments, the court concluded that the beneficial relationship exception did not apply. The court then terminated parental rights, found that the child was adoptable, found it likely that she would be adopted, and set adoption as the permanent plan.

## ANALYSIS

### The Beneficial Parental Relationship Exception Did Not Apply

Mother contends that the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). Father simply joins in her argument. We disagree.

At a section 366.26 hearing, the court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the permanent plan preferred by the Legislature. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) If the court finds that a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one of the exceptions set forth in section 366.26, subdivision (c)(1)(B). One such exception is the beneficial parental relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i). (See *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206.) This exception applies when the parents "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The phrase " 'benefit from continuing the relationship' " refers to a parent/child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575

(*Autumn H*).)  It is the parent's burden to show that the beneficial parental relationship exception applies.  (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1345.)

We note that aside from joining mother's argument that the beneficial parental relationship exception applied, father initially asserts that the correct standard of review is the substantial evidence test.  We acknowledge that "[t]here is some dispute about the precise standard of review that applies to an appellate challenge to a juvenile court ruling rejecting a claim that one of the adoption exceptions applies."  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  Assuming the substantial evidence test applies, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order."  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Mother asserts that she maintained regular and consistent visitation with the child and points to the fact that visitation was liberalized to include unsupervised and overnight visits.  She further states that her relationship with the child "was parental," and that if it were otherwise, the social worker would not have recommended that the child be returned to her care.  Mother points to her testimony at the section 366.26 hearing that the child ran to her at visits, called her "mom," sought affection from her, cried at the conclusion of visits, and asked if she could leave with her.  Additionally, mother brought her clothes, toys, and food.

11

Mother is correct that visits were liberalized to include overnight visits and that she and father progressed to the point that the court returned the child to their care, under a plan of family maintenance. However, we note that, once the child was back in their care, things declined rapidly. The evidence shows that approximately four months after the child was returned to the parents, mother called CFS and said she could no longer care for the child. She and father were fighting a lot in front of the child, and mother wanted a social worker to remove the child from their home. Mother said she was open to having the child adopted. She subsequently changed her mind and said she did not want to lose custody of the child; however, she quickly changed her mind again and said it would be better for the child to be in foster care, since it was too difficult to take care of her. Mother's conduct and impetuous decisions hardly demonstrate that she had a deep parental bond with the child. Rather, the evidence indicates that she was never attached to the child. She initially left the child with relatives with no provisions, and she felt no need to visit her for several weeks. Moreover, after the court detained the child and then returned the child to her, mother voluntarily gave the child back to CFS when circumstances got difficult. She also told the court that it was her wish for the child to be adopted. There was certainly no evidence that mother's relationship with the child promoted the child's well-being "to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents," or that the child had a "substantial, positive emotional attachment such that [she] would be greatly harmed" if the relationship was severed. (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

12

In contrast, the evidence showed that the child and her prospective adoptive parents had a very strong mutual attachment.  Their home was the child's only foster care placement, and she had lived with them the majority of her life.  The prospective adoptive parents loved her and saw her as their daughter, and she considered them her parents.  The child was happy and well cared for.  The prospective adoptive parents wanted to provide a stable, permanent home for her and were committed to raising her to adulthood.

In light of all of this evidence, we conclude that the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i), did not apply here.

<u>DISPOSITION</u>

The court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>HOLLENHORST</u>
J.

We concur:

<u>RAMIREZ</u>
P. J.

<u>MILLER</u>
J.

13